**Matthew D. Kaplan**, OSB No. 980699
KAPLAN LAW, LLC
50 SW Pine Street, Suite 302
Portland, Oregon 97204
T: (503) 226-3844
E: matthew@mdkaplanlaw.com

**Nadia Dahab**, OSB No. 125630
SUGERMAN DAHAB
707 SW Washington St., Ste. 600
Portland, OR 97205
T: (503) 228-6474
E: nadia@sugermandahab.com

*Of Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| RENEE WARREN, Personal Representative of the ESTATE OF SHANE EARL RADER, Deceased,<br><br>Plaintiffs,<br><br>v.<br><br>YAMHILL COUNTY, an Oregon County; TIM SVENSON, an individual; MICHAEL PETRASEK, an individual; JEREMY RUBY, an individual; RICHARD GEIST, and individual; TAMARA HART, an individual; TONI SANZANO, an individual; AUDREY SPENCER, an individual; WELLPATH, LLC, a Delaware corporation; and JOHN DOES 1–10.<br><br>Defendants. | Case No. 3:23-cv-00911<br><br>**COMPLAINT**<br><br>Claims for Damages Including Civil Rights Violations, 42 U.S.C. § 1983, and Pendant State-Law Claims<br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

1.      On the afternoon of June 15, 2021, 46-year-old Shane Rader was arrested by the Newberg Dundee Police Department and processed into the Yamhill County Jail ("the Jail"). When he was interviewed by the arresting officer, Rader told the officer that he had planned to kill himself.  He also mentioned his prior history of suicide attempts and suicidal ideations.  The officer noted on the Jail's Intake Suicide Risk Assessment Sheet that he believed Rader may still be a suicide risk.  Rader was placed on suicide watch and held in a medical cell.

2.      Less than two days later, on June 17, Rader was removed from suicide watch and placed him in a camera-monitored segregation observation cell.  At that time, even though he had been removed from suicide watch, behavioral health providers continued to believe that Rader needed to be watched because of his suicide risk.  Notwithstanding that, Rader was no longer subject to a less-than-15-minute watch, the minimum standard for individuals who present risks to self.  Jail deputies conducted regular security checks in the dayroom outside of Rader's cell at less than one-hour intervals.  The camera in Rader's cell displayed on a video feed in the Jail's "Control Room" as one of dozens of images on the Control Room's 12 monitoring screens.

3.      As part of the Jail's "post-suicide-watch precautions," Rader received periodic mental health worker visits, each of which lasted somewhere between three and eight minutes. During those visits, Rader was diagnosed as intellectually disabled.  The "safety plan" that mental health workers devised during that time provided that Rader should push the intercom button if he experienced suicidal ideations.  The mental health worker visits stopped entirely on June 25.

4.      In Rader's segregation cell, there was a small hole in the bedframe under the mattress.  On June 29, over the course of almost an hour, Rader used the hole in the bedframe

and a towel the Jail had given him to attempt suicide while on camera in his cell.  None of the deputies or medical staff members noticed or acknowledged his attempts.  At approximately 7:30 p.m. that night, Rader successfully died by suicide using the same method he had attempted previously.  Rader's suicide was visible by video in the Control Room.

5.    Jail Deputy Tamara Hart, who was stationed in the Control Room that evening, noticed Rader's condition at 7:30 p.m. but did not respond.  More than ten minutes later, after Rader had not moved, she called his name over the intercom.  When he did not respond, she requested a deputy visit Rader in his cell.

6.    Jail deputies and medical staff arrived in Rader's cell at 7:47 p.m. and initiated life-saving medical efforts.  Those efforts were not successful.

## JURISDICTION AND VENUE

7.    This action arises under the constitution and laws of the United States, and jurisdiction is based on 28 USC § 1331 and 28 USC § 1343(a).  This Court has pendant jurisdiction of the state-law negligence claims pursuant to 28 USC § 1367.

## PARTIES

8.    Plaintiff Renee Warren is the duly appointed personal representative of the Estate of Shane Earl Rader.  Shane Rader was born in Portland, Oregon, on January 1, 1975.  At the time of his death, Rader was a citizen and a resident of the State of Oregon.  He is survived by his father, Frank Rader, and his three children, Nathan Rader, Hunter Rader, and Isaiah Rader.

9.    At all times relevant, Rader was a pretrial detainee at the Yamhill County Jail.

10.    Wellpath, LLC ("Wellpath") is a Delaware corporation authorized to conduct business in Oregon.  Its business is providing medical services in jails and prisons nationally, including in the Yamhill County Jail.  At all times relevant, Wellpath was acting under color of

state law.

11.     Yamhill County is an Oregon county.  Yamhill County operates the Jail and contracted with Wellpath to provide all necessary medical care to pretrial detainees and inmates held at the Jail.

12.     Toni Sanzano is a Qualified Mental Health Professional (QMHP) licensed by the State of Oregon.  At all times relevant, Sanzano was employed by the Yamhill County Health and Human Services Department to provide mental health treatment at the Yamhill County Jail. Sanzano was an agent of Yamhill County, actual or implied, acting within the course and scope of her agency.  On information and belief, Sanzano is a citizen and resident of the State of Oregon.

13.     Audrey Spencer is a Qualified Mental Health Professional (QMHP) licensed by the State of Oregon.  At all times relevant, Spencer was employed by the Yamhill County Health and Human Services Department to provide mental health treatment at the Yamhill County Jail. Spencer was an agent of Yamhill County, actual or implied, acting within the course and scope of her agency.  On information and belief, Spencer is a citizen and resident of the State of Oregon.

14.     Michael Petrasek is a registered nurse (RN) licensed by the State of Oregon.  At all times pertinent, Nurse Petrasek was employed by Wellpath as a nurse and as Health Services Administrator in the Yamhill County Jail.  As Health Services Administrator, Nurse Petrasek was responsible for the implementation of Wellpath's policies and procedures.  Nurse Petrasek was an agent of Wellpath, actual or implied, acting within the course and scope of his agency. On information and belief, Petrasek is a citizen and resident of the State of Oregon.

15.     Captain Richard E. Geist was at all times relevant the Commander of the Yamhill

County Jail and an employee of Yamhill County. Geist was an agent of Yamhill County, actual or implied, acting within the course and scope of his agency. On information and belief, he is a citizen and resident of the State of Oregon.

16.     Tim Svenson is the Sheriff of Yamhill County. At all times relevant, Sheriff Svenson was an agent of Yamhill County, actual or implied, acting in a supervisory role and in a position to implement policies, customs, and practices on behalf of Yamhill County. At all times relevant, Sheriff Svenson was acting within the course and scope of his agency. In his position of Sheriff, he is responsible for ensuring that people being held at the Yamhill County Jail receive constitutionally adequate medical services. On information and belief, Sheriff Svenson is a citizen and resident of the State of Oregon.

17.     Jeremy Ruby was at all times relevant a Yamhill County employee working in the Yamhill County Sheriff's Office and the Yamhill County Jail. On Plaintiff's information and belief, Ruby participated in the day-to-day operations of Yamhill County Jail and was in a position to implement policies and practices on behalf of Yamhill County. Ruby was an agent of Yamhill County, actual or implied, acting within the course and scope of his agency.

18.     Tamara Hart was at all times relevant a Yamhill County employee working in the Yamhill County Jail as a corrections officer. Deputy Hart was an agent of Yamhill County, actual or implied, acting within the course and scope of her agency. On information and belief, she is a citizen and resident of the State of Oregon.

19.     John Does 1–10 are Wellpath employees and supervisors responsible for the provision of medical services at the Yamhill County Jail between June 15 and June 29, 2021. At all times herein pertinent, John Does 1–10 were acting under color of state law.

**FACTUAL ALLEGATIONS**

20.     The Yamhill County Jail houses pretrial detainees and persons convicted of crimes.  Yamhill County and Sheriff Svenson are charged by law with the responsibilities of administering, managing, and supervising the health care delivery system at the Yamhill County Jail.  This duty to provide medical care is a nondelegable duty.

YAMHILL COUNTY CONTRACTS WITH WELLPATH TO PROVIDE MEDICAL CARE
AT THE YAMHILL COUNTY JAIL

21.     Beginning in 2017, Yamhill County contracted with Wellpath to administer and provide medical care to pretrial detainees and persons convicted of crimes housed in the Yamhill County Jail.  The contract between Yamhill County and Wellpath states that Wellpath shall identify to the County and the Sheriff those members of the Jail's population with medical or mental health conditions which may be worsened as a result of incarceration at the Jail or which may require extensive care while incarcerated.  After review, and when safety and security risks permit, the Sheriff shall use reasonable best efforts and shall work with Wellpath to have such detainees or inmates released, transferred, or otherwise removed from the correctional setting if this can be done while ensuring the reasonable safety and security of the detainee or inmate.

YAMHILL COUNTY AND WELLPATH HAVE A DUTY TO PROVIDE
CONSTITUTIONALLY ADEQUATE MEDICAL CARE AT THE
YAMHILL COUNTY JAIL.

22.     The National Commission on Correctional Health Care ("NCCHC") publishes "Standards for Health Services in Jails" ("NCCHC Jail Standards"), which are considered an authoritative source for correctional health care standards.  On Plaintiff's information and belief, Wellpath promised that its healthcare services at the Yamhill County Jail would meet NCCHC Jail Standards.

23.     NCCHC Jail Standard J-A-01 states that it is "essential" that inmates have access

to care for their serious medical, dental, and mental health needs.  Jail Standard J-A-01 provides

that "[a]ccess to care means that, in a timely manner, a patient is seen by a qualified health care

professional, is rendered a clinical judgment, and receives care that is ordered."  Jail Standard J-

A-01 notes that "[i]nmates must have access to care to meet their serious health needs."  This is

the fundamental principle on which all NCCHC standards are based and is the basic principle

established by the U.S. Supreme Court in the *Estelle v. Gamble*, 429 U.S. 97 (1976).  The

standard gives several examples of "[u]nreasonable barriers to inmates' health services,"

including "[h]aving an understaffed, underfunded, or poorly organized system with the result that

it is not able to provide appropriate and timely access to care."

24.     NCCHC Jail Standard J-B-05 states that it is "essential" that "[s]uicides are

prevented when possible by implementing prevention efforts and intervention."  Jail Standard J-

B-05 provides that "[t]he responsible health authority and facility administrator approve the

facility's suicide prevention program."

25.     NCCHC Jail Standard J-E-02 states that it is "essential" that "[s]creening is

performed on all inmates upon arrival at the intake facility to ensure that emergent and urgent

health needs are met."  Jail Standard J-E-02 provides that "[r]eception personnel [should] ensure

that persons who are * * * mentally unstable * * * are referred immediately for care and medical

clearance into the facility."  The term "medical clearance" is defined as "a documented clinical

assessment of medical, dental, and mental status before an individual is admitted into the facility.

The medical clearance may come from on-site health staff or may require sending the individual

to the hospital emergency room."  The standard notes that "[i]nmates with mental disorders are

often unable to give complete or accurate information in response to health status inquiries.

Therefore, it is good practice for mental health staff to be involved in training staff who do the

intake screening."

26.    NCCHC Jail Standard J-E-04 states that it is "essential" that "[i]nmates receive initial health assessments."  Jail Standard J-E-04 provides that the initial health assessment should take place within 14 days of admission into the jail and should be done by a qualified healthcare professional.  The standard explains that "[t]he health assessment is the process whereby an individual's health status is evaluated, including questioning the patient about symptoms.  The extent of the health assessment is defined by the responsible physician but should include at least the steps noted in this standard."

27.    NCCHC Jail Standard J-F-01 states that it is "essential" that "[p]atients with chronic disease, other significant health conditions, and disabilities receive ongoing multidisciplinary care aligned with evidence-based standards."  The standard provides that mood disorders and psychotic disorders are examples of the types of health conditions that fall under this standard.

28.    NCCHC Jail Standard J-F-03 states that it is "essential" that "[m]ental health services are available for all inmates who require them."  Jail Standard J-F-03 explains that "[i]n the correctional setting, as in most other environments, the immediate objective of mental health treatment is to alleviate symptoms of mental disorders and prevent relapses in order to sustain patients' ability to function safely in their environment."

29.    NCCHC Jail Standard J-G-02 states that it is "essential" that "[a]ny practice of segregation should not adversely affect an inmate's health."  The standard provides that, "[u]pon notification that an inmate has been placed in segregation, [a] qualified health care professional reviews the inmate's health record."  Jail Standard J-G-02 explains that "[c]hecks by health staff must be done to ensure that each segregated inmate has the opportunity to request care

for medical, dental, or mental health problems.  These visits also enable health staff to ascertain the inmate's general medical and mental health status.  Inmates often experience irritability, anxiety, or a dysphoric mood within weeks of placement in social isolation." Jail Standard J-G-02 cautions that "[s]pecial attention should be given to vulnerable populations, such as adolescents and the mentally ill."  The standard also warns that "[d]ue to the possibility of injury and depression during isolation, the evaluations by health staff should include notation of bruises or other trauma markings, comments regarding the inmate's attitude and outlook (particularly as they might relate to suicidal ideation), and any health complaints."

30.    The NCCHC also publishes "Standards for Mental Health Services in Correctional Facilities" ("NCCHC Mental Health Standards").

31.    NCCHC Mental Health Standard MH-E-07 states it is "essential" that "[t]he mental health of segregated inmates is monitored regularly."  The standard provides, in relevant part,

(a)    On notification that an inmate is placed in segregation, mental health staff reviews the inmate's mental health record to determine whether existing mental health needs contraindicate the placement or require accommodation. Such review is documented in the clinical record;

(b)    For inmates housed in segregation, qualified mental health professionals provide mental health services according to established treatment plans and respond in a timely manner to referrals; and

(c)    Inmates who are segregated and have limited contact with staff or other inmates are monitored 3 days a week by a medical or qualified mental health professional.

The standard explains that "[t]he intent of this standard is that mental health staff monitor segregated inmates for signs of mental or physical decompensation.  Persons in segregated environments are vulnerable to mental illness and often experience irritability, anxiety, or

depression."  The standard notes that "[i]t is important to coordinate procedures to ensure that segregated inmates who are on the mental health caseload are appropriately monitored and managed."  It warns that "[b]ecause segregation can exacerbate preexisting conditions, staff should be extra cautious when placing vulnerable inmates in segregation."  The standard also cautions that "[m]ental health staff should provide medical and custody staff with clear guidelines regarding behaviors, verbal statements, medication refusals, and cell conditions that require a mental health referral."  The standard points out that "[m]any correctional systems screen for the presence of serious mental illness so that such inmates are not eligible for * * * long-term placement in segregation."  All aspects of Mental Health Standard MH-E-07 should be addressed by written policy and defined procedures.

32.    NCCHC Mental Health Standard MH-G-04 states it is "essential" that a facility identify suicidal inmates and intervene appropriately through a suicide prevention program. The standard provides that, for "non-acutely suicidal" inmates or detainees, an appropriate suicide prevention program should provide for monitoring on an unpredictable schedule with no more than 15 minutes between checks.  If a non-acutely suicidal inmate or detainee is placed in an isolation cell, constant observation is required.  A person is non-acutely suicidal if they express current suicidal ideations or have a recent history of self-destructive behavior.  Under the standard, non-acutely suicidal inmates or detainees "who deny suicidal ideation or do not threaten suicide but demonstrate other concerning behavior (through actions, current circumstances, or recent history) indicating the potential for self-injury should be placed on suicide precautions and observed at staggered intervals not to exceed every 15 minutes."  A person is acutely suicidal if they are engaging in self-injurious thinking and behavior or threaten suicide with a specific plan.

33.     Under Mental Health Standard MH-G-04, key components of a suicide prevention program include, among others, training, identification, evaluation, treatment, housing and monitoring, and intervention.  An adequate suicide prevention program should address treatment needs when the patient is at heightened risk for suicide, as well as follow-up interventions and monitoring strategies to reduce relapse.  A person may be at heightened risk of suicide during so-called "high-risk periods," which include "the time immediately upon admission, following new legal problems (*e.g.*, new charges, additional sentences, institutional proceedings, denial of parole), [or] after the receipt of bad news regarding self or family (*e.g.*, serious illness, the loss of a loved one)."  In all events, "[b]ecause suicide is a leading cause of death in correctional facilities nationwide, an active approach to the management of suicidal inmates is recommended."

34.     The mental health authority should approve a facility's suicide prevention plan, including training for staff and screening procedures.  All aspects of a suicide prevention plan should be addressed in a written policy and defined procedures consistent with Mental Health Standard MH-G-04.

35.     NCCHC Mental Health Standard MH-G-03 states it is "essential" that a facility prepare individual mental health treatment plans for inmates and detainees in need of mental health treatment.  A treatment plan is a series of written statements specifying a patient's particular course of therapy and roles of qualified mental health professionals in carrying it out. Mental Health Standard MH-G-03 requires that individual treatment plans address, at a minimum, (a) the frequency of follow-up for evaluation and adjustment of treatment modalities, (b) adjustment of medications as needed, (c) referrals for psychological testing, medical testing, and evaluation, as needed, (d) instructions relating to diet, hygiene, exercise, and adoption to

correctional environment, and (e) the documentation of treatment goals and objectives, needed interventions to achieve goals, and clinical progress.  Again, all aspects of Mental Health Standard MH-G-03 should be addressed by written policy and defined procedures.

SHANE RADER DIES AT THE YAMHILL COUNTY JAIL

36.    On Tuesday, June 15, 2021, Shane Rader was taken into custody by Newberg-Dundee Police Department (NDPD).  He was interviewed by an NDPD Officer.  During the interview, Rader told the officer that he needed medical help, including, specifically, mental health care for "what [he] had been going through."

37.    NDPD transported Rader to the Yamhill County Jail, where he arrived at 12:03 p.m.  Rader was immediately placed into an interview room, where he was interviewed again, this time by Yamhill County Sheriff's Office Detective Todd Steele.

38.    During the booking process, Yamhill County Sheriff's Office Detective Will Lavish completed a Suicide Risk Assessment Sheet.  On the sheet, Detective Lavish marked "Yes" to Question No. 1 ("Did the prisoner say anything about wanting to die or kill them self?"); "Yes" to Question No. 4 ("Does the prisoner have suicidal history in our facility or any correctional facility they have been to?"); and "Yes" to Question No. 8 ("Do you believe your prisoner may be a suicide risk now?").  Rader had stated multiple times that, earlier in the day, he had thoughts of killing his family and himself.  Rader was thereafter dressed in a safety smock and housed in "Hold-03" on a less than 15-minute suicide watch.  The suicide watch started at 4:56 p.m.

39.    After Rader had been at the Yamhill County Jail for approximately two hours, a Screening Exception Form was completed for Rader by an EMT.  The form documents the EMT's second attempt at conducting a physical screening on Rader, which occurred at 6:55 p.m.

The form states that the screening was not completed because Rader was "on suicide watch, mentally unstable, for safety reasons will try again."

40.    The next day, on June 16, Rader was seen by QMHP Toni Sanzano because of the suicide precautions that were in place.  Sanzano's visit with Rader lasted seven minutes.  After the visit, Sazano noted that "C[t] presents calm but cries when mentions son; affect is blunted . . . . Ct had thoughts of killing his entire family as well as himself . . . . He felt that if he couldn't have contact with his kids, he had no reason to live.  Ct. reports he was suicidal when his daughter passed away 19 years ago.  At that time planned to jump, hang self, or use train tracks." Sanzano noted Rader's diagnosis as "ID"; upon Plaintiff's information and belief, "ID" means Intellectual Disability.  Sanzano continued the suicide watch.

41.    Later that afternoon, Rader was arraigned.

42.    On June 17, QMHP Audrey Spencer met with Rader for a total of eight minutes. Although Rader denied any suicidal ideation, Spencer documented in her notes that Rader presented with "poor cause and effect relationships in thought content," that his speech was disjointed, and that his judgment and insight were poor.  Spencer concluded that "Ct was able to safety plan by promising to press the intercom button if [suicidal ideations] returns while in custody."  She noted further, "Overall presentation and functioning appearing consistent with ID dx at this time."  At 11:45 a.m., Spencer recommended that Rader's suicide watch be removed but that he be housed in a camera room.  Defendant Ruby approved Spencer's recommendation.

43.    Rader was thereafter moved to a camera cell known as "King-2."  Jail staff requested that mental health professionals continue daily checks while Rader was isolated due to COVID-19 quarantine restrictions.

44.    For the next four days, between June 18 and June 21, Rader "preferred to stay in

cell mostly." He was visited once daily by either Toni Sanzano or Audrey Spencer. Each meeting lasted between three and seven minutes. The notes from the visits contain observations such as Rader "continues to present with inappropriate laughter, euthymic, and incongruent affect" and his "thought content [is] childlike and abrupt at times."

45.    On June 23, Rader was arraigned on his indictment.

46.    On June 25, Spencer noted that the "post-suicide watch precautions" were complete.

47.    On June 28, Registered Nurse (RN) Maria Spear attempted to perform a physical exam on Rader. Spear documented that Rader had refused the physical exam. Neither Rader nor any witness signed the refusal documentation, as required under Jail policy.

48.    On June 29, at approximately 6:00 p.m., Rader was in his cell. The security camera in his cell was turned on, and his activities were visible from the Jail's Control Room. Deputy Tamara Hart was in the Control Room, where she was assigned from the beginning of her shift that evening.

49.    Between approximately 6:19 p.m. and 7:33 p.m., the video feed from Rader's cell camera shows him restlessly turning on his bunk, pulling a towel over his shoulders and around his neck, fidgeting underneath his blanket, pulling the towel into a rope and making adjustments to make the towel rope tighter, awkwardly sliding his weight on and off the bunk, and getting off of his bunk entirely and sitting on the floor.

50.    At approximately 7:29 p.m., the video shows Rader slide off his bunk, with the towel tied between the corner of the bunk and his neck. He appears to drop all of his weight into the hold on his neck, leaning against the wall, his feet out in front of him.

51.    At approximately 7:33 p.m., Deputy Hart, stationed in the camera room, noticed

that Rader was on the floor with his head against the wall.  On the video, Rader's face has turned

dark purple.  The towel is visible around Rader's neck, stretching across the mattress to the

corner of the bunk nearest the wall.

52.    Deputy Hart did not do anything for more than 10 minutes.  After she concluded

that she had not seen any movement from Rader on the video for at least 10 minutes, she called

his name over the intercom.  When he did not respond to that call, she asked for an available

deputy to check on Rader in his cell.

53.    At 7:46 p.m., Yamhill County Jail Deputies Jeff Donahoo and Steve Reid entered

Rader's cell and immediately saw that Rader had "hung" himself by anchoring a towel to a small

hole on his bunk nearest the wall, using that towel as a ligature between the hold and his neck,

and sliding his weight off of his bunk.  The deputies cut the towel that Rader had used to hang

himself.  Free from the towel, Rader's body slid and hit his head on the cell floor.  Deputy Reid

pulled Rader by his feet so that he was lying fully on the floor in the center of the cell.  Deputy

Donahoo began chest compressions, and Deputy Reid exited the cell.

54.    At approximately 7:47 p.m., Deputy Reid reentered Rader's cell with an AED and

several Wellpath medical staff.

55.    At approximately 7:53 p.m., paramedics arrived and took over life-saving medical

efforts.  Rader did not survive.

<u>YAMHILL COUNTY'S HISTORY OF DELIBERATE INDIFFERENCE TO THE SERIOUS<br>MEDICAL NEEDS OF JAIL INMATES AND DETAINEES</u>

56.    The Yamhill County Jail has, by its own accounts, an alarming history of in-

custody deaths and other incidents that demonstrate its consistent failures to follow policies

relating to monitoring of and provision of medical care to individuals in its custody.

57.    In May 2015, Jed Hawk Myers died while in custody at the Yamhill County Jail.

While he was in custody, Myers was moved to a cell in the medical housing unit after suffering serious injuries from being assaulted by two other inmates.  He was evaluated by an unqualified Med Tech who did not take any vital signs.  Myers was in visible distress and rang an intercom for help 19 times.  He urinated blood in the toilet inside his cell.  Jail deputies observed the distress and bloody urine through the cell's camera feed to the Jail Control Room, but they never passed this information to the Med Tech or medical staff and did nothing to help Myers.  Myers spent over five hours in his cell before dying.  It was only when he had slumped down onto the floor and stopped breathing that he received any direct medical attention.

58.    In June 2015, the Lincoln County and Multnomah County Sheriff's Departments conducted an independent review of the Yamhill County Jail.  The review concluded that the Yamhill County Jail was overly dependent on video monitoring and recommended that the medical housing area have physical/visual rounds conducted in the medical housing every 30 minutes at irregular intervals.

59.    In October 2016, Debbie Kocan-Samples died of suicide while in custody at the Yamhill County Jail.  Kocan-Samples was arrested on an outstanding warrant after 911 calls reporting that she was suicidal.  Because of her level of intoxication, she was first taken to the Willamette Valley Medical Center. While she was there, she was seen by a mental health specialist, who reported to a Yamhill County Jail deputy that Kocan-Samples should be placed on suicide watch.  The hospital then cleared her to be booked into the Jail.  The deputy who had received the information from the hospital passed it to a Sergeant, who failed to pass it along to the appropriate medical or corrections staff.  No watch was ever started.  Despite the fact that, like Rader and Myers, she was placed in a cell equipped with a camera, she was not adequately monitored and took her own life while she was incarcerated.  She did so by hanging herself,

using a phone cord in her holding cell as a ligature.

60.    In July 2017, Yamhill County settled Jed Hawk Myers' case for $5,000,000. Thereafter, Yamhill County Sheriff Tim Svenson issued a statement about the lawsuit and settlement, stating, "I can * ** assure you, our citizens, that we continue to make our jail a more secure, attentive facility to all who are confined here, whatever the reason.  It is important to understand that I hold all my staff to a high standard and expect professionalism and compassion to be an important presence in their daily duties."[1]

61.    In 2017, Yamhill County settled Kocan-Samples' case for $1,000,000.

62.    In August 2017, Sheriff Svenson published an article in the Yamhill County *News Register* entitled *Moving the Office Forward*.[2]  In his article, Sheriff Svenson took responsibility for the mistakes made by his office and promised to make things better.  He assured the public that he would undertake a "thorough review of jail procedures and policies with a critical eye to identifying areas for improvement that will ensure greater inmate safety."  He also stated he had "implemented procedural improvements designed to assist jail personnel with triaging inmates both for physical and mental health issues."  He stated he was "in the process of initiating a thorough outside review of all jail operations" to identify areas for improvement and adopt best practices in all aspects of jail operations.  He promised to make recommendations from the outside review available to the public.  He also reports that he was "in the process of developing a Citizens' Advisory Board" to seek counsel and encourage citizens' advice on matters of concern.  Finally, he promised to "stand up and own up when mistakes are made."

---

[1]    Tim Svenson, Statement on the Jed Hawk Myers Settlement (July 26, 2017), *available at* http://media.oregonlive.com/portland_impact/other/Yamhillsheriffstatement.pdf (last visited June 19, 2023).
[2]    Tim Svenson, *Moving the Office Forward*, News Register (Aug. 25, 2017), *available at* https://newsregister.com/article?articleId=27146 (last visited June 1, 2023).

63.     In January 2018, less than five months later, Kathleen Norman died in the custody of the Yamhill County Jail after she was locked in a medical cell without receiving treatment for the severe alcohol withdrawal symptoms she was experiencing.  Norman was arrested on an outstanding warrant after a family member called the NDPD hoping to get Norman to a safe place where she could properly detox.  She was initially taken to Providence Newberg Medical Center with a blood alcohol concentration of 0.522.  Providence Newberg later cleared Norman for transfer to the Yamhill County Jail, but only after calling the Jail to confirm that it had the resources to care for patients who were detoxing.  Norman was booked into the Jail, did not receive treatment for her withdrawal symptoms, and died after spending just 3.5 hours alone in her cell.  Like Rader, Myers, and Kocan-Samples, Norman's cell was equipped with a camera and a video feed to the Yamhill County Jail Control Room.

64.     Eight days after Norman's death, Sheriff Svenson was quoted in an article published in the *News Register* entitled *Newberg Woman Dies Following 'Medical Emergency' in the Jail*.[3]  The subject of the article was Norman's death on January 15.  In that article, Sheriff Svenson ratified the behavior of the Yamhill County Jail staff by saying "there is 'zero indication' the staff was negligent in any way"; "[s]taff did everything they could, they followed policies and reacted as appropriately as they could."  In this same article, he also stated that Wellpath "was doing a great job."

65.     In January 2021, Brent Cordie died of suicide in the Yamhill County Jail after he was found hanging in his cell during a security check, unresponsive.  Cordie had initially been placed on suicide watch but was removed from the watch just one day later.  The safety plan that

---

[3]     Paul Daquilante, News Register, *Newberg Woman Dies Following 'Medical Emergency' in Jail* (Jan. 19, 2019), https://newsregister.com/article?articleTitle=newberg-woman-dies-following-medical-emergency-in-jail--1516401569--28567-- (last visited June 4, 2023).

the County's mental health workers had devised for Cordie provided that, like Rader, he should press the intercom button in his cell to report to Jail staff if he was experiencing suicidal thoughts or intent.  Cordie had repeatedly asked Jail mental health workers for anxiety and depression medication, but he was not seen by a provider who was able to prescribe those medications. Cordie died by suicide in his cell by hanging himself, using a towel as a ligature.  As with Rader, he had tied the towel to two holes in his bunk.

<u>WELLPATH'S HISTORY OF DELIBERATE INDIFFERENCE TO THE SERIOUS<br>MEDICAL NEEDS OF JAIL INMATES AND DETAINEES</u>

66.    On Plaintiff's information and belief, Wellpath operates in nearly 40 states, with over 15,000 employees and a gross sales revenue of at least $1,200,000,000.

67.    Wellpath has a long history of deliberate indifference to the serious medical needs of jail inmates and detainees.

68.    In August 2015, Pierce County, Washington, cancelled its contract with Wellpath. The next month, Pierce County's Prosecuting Attorney sent Wellpath a letter in response to a demand for payment.  In that letter, the Prosecuting Attorney laid out the "many areas in which [Wellpath] was in default," providing the following list: failure to verify medications at booking; delays in care; poor quality of care; poor record keeping at every level; failure to triage; lag times in getting reports to providers; continued staff shortages and almost weekly turnover; constant lack of leadership; lack of trained personnel; unscheduled shifts; failure to provide basic services; failure to timely review or address inmate requests for medical services; significant pharmacy problems; inmates not getting their medications; staff failure to keep medical records on patients; and many others.  The letter continued, "Indeed, the only things [Wellpath] can fault the County for are (1) believing [Wellpath] when they made assurances that they would implement measures to bring their operation of the clinic up to medical standards and (2) giving

[Wellpath] time to accomplish it." The letter explained that "[a] lawsuit against Pierce County would flush out [Wellpath's] deplorable performance in running the medical clinic, which would not only result in considerable cost and embarrassment to [Wellpath], but would also provide evidence to support claims filed by other institutions who suffered the same disappointment as Pierce County." The letter noted that the County "compiled independent, detailed documentation of countless errors by [Wellpath] staff that "will shock the conscience of the court." The letter concluded by stating that "[a] jury would likely find that [Wellpath's] operation of the jail medical clinic was incompetent, unprofessional and morally reprehensible."

69.     In March 2019, a jury found that Wellpath had violated its contract with Pierce County and ordered Wellpath to pay the County $1,560,000.

70.     In January 2016, Dillon Blodgett committed suicide at the detention facility in Montrose County, Colorado. Blodgett had been placed in solitary confinement and had reported suicidal ideations and a previous suicide attempt. Wellpath was responsible for providing medical and mental health care at the Montrose County facility. In November 2017, Blodgett's estate sued Wellpath, alleging Wellpath's long history of inadequate medical and mental health care provided by Wellpath in Colorado and across the country.

71.     In March 2016, Sheriff Terry Box of the Collin County (Texas) Sheriff's Office wrote that, when Wellpath was providing the medical and mental health care at his jail, "we had a list of 80 inmates waiting to see the psychiatrist."[4] With its new provider, which is not Wellpath, he wrote that "[n]ow we don't have a waiting list. Most inmates are seen within 48 to 72 hours and sometimes the same day as the request or referral is made."

---

[4]     *See, e.g.*, Blake Ellis & Melanie Hicken, CNN, *CNN Investigates Preventable Deaths and Dangerous Care* (2019), *available at* https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/ (last visited June 2, 2023).

72.     In August 2017, Teresa Nall twice attempted suicide in the Kitsap County (Washington) Jail.  After her first suicide attempt, Nall was placed in a solitary crisis cell for a brief period.  Shortly after a counselor released her from that cell, Nall attempted suicide again and suffered serious permanent injuries.  Nall did not see a psychiatrist, psychologist, or medical doctor after her first suicide attempt.  Wellpath was responsible for providing medical and mental health care at the Kitsap County facility.

73.     In September 2017, Jesses Binam hung himself in the Mesa County (Colorado) Detention Center.  Binam died from his injuries after being transferred to a local hospital. During his week in custody, Binam made suicide statements and required medication and treatment for serious mental illness.  He was taken off suicide watch and moved to administrative segregation because of his behavior.  He then hung himself in the segregation cell.  Wellpath was responsible for providing medical and mental health care at this facility.

74.     In October 2017, Fulton County (Georgia) notified Wellpath that it was terminating for cause its contract with Wellpath to provide medical services for inmates at the Fulton County Jail.  The termination letter described a series of uncured deficiencies and noted that "most seriously, the Fulton County Sheriff's Office has reported five deaths at the Fulton County Jail in the last seventy-five days . . . ."

75.     In November 2017, Sheriff Gary Simpson of the Kitsap County (Washington) Sheriff's Office sent a letter to Wellpath detailing several problems with the medical services being provided by Wellpath.  Sheriff Simpson wrote, "In light of recent events and questions I have been asking our staff, I am finding the more I learn, the more questions arise regarding our partnership and relationship with [Wellpath]."  The problems included staffing issues, questions about the "veracity and ability to effectively supervise and manage staff" of the Health Services

Administrator, and Wellpath's failure to perform initial health assessments in a timely fashion.

76.    In January 2018, Brian Roundtree died by suicide at the Arapahoe County (Colorado) Detention Facility.  Roundtree was suffering from severe mental illness and initially was placed on suicide watch when he was booked into the jail.  Less than 24 hours later, he was removed from suicide watch by a counselor.  He never saw a psychiatrist, a psychologist, or a medical doctor.  He died of suicide later that day.  Wellpath was responsible for providing medical and mental health care at this facility.

77.    In May 2018, Commander Mike Anderson of the Clark County (Washington) Sheriff's Office sent a letter to Wellpath.  Commander Anderson noted that "[Wellpath] has always referred to Clark County as their flag ship on the west coast.  During our discussion I communicated to you that your flag ship was taking on water and in danger of sinking.  This is directly related to [Wellpath]'s inability to staff and provide mental health services from 1/12/18 as required by the contract."  Anderson described problems staffing mental health positions for several months, along with a lengthy waiting list of people who needed to see a mental health professional.  He concluded: "It is painfully obvious that there is disconnect somewhere in the communication process at the corporate level or other levels of management within [Wellpath]. I would like to know what your plan is to rectify this situation."

78.    In July 2018, 34-year-old Janelle Butterfield was booked into the Josephine County (Oregon) Jail after failing to appear in court on some misdemeanor charges.  Butterfield had a history of severe mental illness that was known to the staff at the jail, including to its medical and mental health providers.  During her 40 days in custody, Butterfield did not see a single doctor, nurse practitioner, physician's assistant, or nurse employed by the medical or mental health providers.  She was placed in a segregation unit and checked once a day by people

with EMT licenses.  Her antipsychotic medication was discontinued without explanation after 16

days in custody. After 30 days in custody, her attorneys raised concerns about her mental state

with the court.  After 40 days, she died by suicide in her segregation cell.  Wellpath was

responsible for providing medical and mental health care at this facility.

79.     In March 2021, Carlos Patino Regalado died by suicide at the Monterey County

(California) Jail.  Regalado had been in custody for about a month and had been on and off

suicide watch several times, sometimes for expressing suicidal thoughts, other times because

of actual suicide attempts.  Earlier on the day he hung himself, Regalado had been on a suicide

watch because he had just returned from the hospital following a "psychiatric emergency."

The watch was discontinued, and he was placed in an isolation cell that contained a number of

hanging points.  Wellpath was responsible for providing medical and mental health care at this

facility.

80.     In April 2022, Carlos Chavez died by apparent suicide at the Monterey County

(California) Jail.  Chavez had been on suicide watch; after being removed from the watch, he

died less than a day later.  Wellpath was responsible for providing medical and mental health

care at this facility.

**FIRST CLAIM FOR RELIEF**
Delay and Denial of Essential Medical Care
42 U.S.C. § 1983 – 8th and 14th Amendments

81.     Plaintiff realleges and incorporates all previous paragraphs as if fully set forth

herein.

82.     As a pretrial detainee, Rader was entitled to due process and entitled to be free

from cruel and unusual punishment pursuant to the Eighth and Fourteenth Amendments to the

U.S. Constitution.  The prohibitions against cruel and unusual punishment apply to jail

conditions and the provision of medical care in jail.

83.     The acts and omissions of Defendants, and each of them, deprived Rader of his due process rights and subjected Rader to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution.  Through those acts and omissions, Defendants were deliberately indifferent to Rader's serious medical needs and personal safety. Defendants further violated guarantees set forth under the Eighth and Fourteenth Amendments by causing undue delay and denying Rader's access to medically necessary care and treatment.

84.     Defendants Svenson, Ruby, Geist, Hart, Sanzano, Spencer, and John Doe Defendants 1–5 were deliberately indifferent to Rader's rights under the Eighth and Fourteenth Amendments of the U.S. Constitution in one or more of the following ways:

(a)     In failing to properly and fully screen Rader at the time that he was admitted to the Yamhill County Jail;

(b)     In failing to provide Rader with proper and competent medical and mental health care and treatment for his serious medical condition;

(c)     In failing to recognize that Rader was not medically stable, was in need of mental health treatment, and was a risk to himself and/or others;

(d)     In failing to prepare an adequate safety plan in the circumstances of Rader's risk of danger to himself and others;

(e)     In placing Rader in a cell that had a bunk with a hole that could be used as a ligature or hanging point and therefore presented a risk of serious harm;

(f)     In failing to adequately monitor Rader in his cell;

(g)     In relying on remote video monitoring when in-person monitoring was medically necessary and appropriate;

(h)     In failing to conduct regular in-person checks on Rader in less than 15-minute intervals;

(i)     In failing to ensure that Rader received ongoing medical care and treatment from qualified mental health professionals;

(j)     In failing to coordinate care between county mental health providers, medical providers, and Jail staff, including by failing to provide mechanisms through which to escalate the level of medical or mental health treatment necessary and appropriate for Rader's medical needs;

(k)     In failing to ensure that Rader received access to qualified medical and mental health providers able to treat his condition, including by prescribing medication, providing constant observation, and transferring Rader, if necessary, to a facility equipped with such providers;

(l)     In operating the Jail, including the Control Room and the Jail's holding cells, with staffing levels insufficient to adequately monitor, observe, and treat inmates and detainees with serious medical and mental health conditions; and

(m)     In failing to respond to Rader's medical emergency with timely, lifesaving efforts.

85.     As a direct result of the actions and inactions of Defendants, and each of them, Shane Rader endured and suffered severe physical, emotional, and mental distress and died of suicide.  Rader's children, the beneficiaries of his estate, have been denied Rader's love, society, and companionship.  Rader's estate incurred medical expenses and funeral expenses.  Rader's estate is entitled to compensatory damages in an amount the jury determines is appropriate.

86.    The actions of defendants Svenson, Ruby, Geist, Hart, Sanzano, Spencer, and John Doe Defendants 1–5 were recklessly and callously indifferent to Rader's rights and physical safety, and punitive damages should be awarded in an amount the jury determines is appropriate.

87.    Plaintiff is entitled to her necessary and reasonable attorneys' fees and costs incurred in the prosecution of this action.

### SECOND CLAIM FOR RELIEF
42 U.S.C. § 1983 – *Monell* – 8th and 14th Amendments

88.    Plaintiff realleges and incorporates all previous paragraphs as if fully set forth herein.

89.    Defendant Yamhill County is a municipal corporation created under the laws of the State of Oregon.  Yamhill County is a "person" under 42 U.S.C. § 1983.

90.    Defendants Yamhill County and Wellpath were deliberately indifferent to Rader's serious medical needs and his rights under the Eighth and Fourteenth Amendments to the U.S. Constitution.  The policies, customs, or practices that were the moving forces resulting in the deprivation of Rader's Eighth and Fourteenth Amendment rights were the following policies, customs, or practices of Yamhill County and Wellpath:

        (a)    A policy, custom, or practice of relying on remote video monitoring of inmates and detainees, including those with a known risk of harm to self or others;

        (b)    A policy, custom, or practice of operating the Control Room at staffing levels insufficient to adequately monitor inmates and detainees, including those with serious medical and mental health needs;

        (c)    A policy, custom, or practice of failing to coordinate care between medical

providers, mental health providers, and Jail staff;

(d)    A policy, custom, or practice failing to coordinate care between county mental health providers, medical providers, and jail staff, including by failing to provide mechanisms through which to escalate the level of medical or mental health treatment necessary and appropriate for the medical needs of inmates and detainees;

(e)    A policy, custom, or practice of failing to provide inmates and detainees access to qualified medical and mental health providers able to treat serious medical conditions, including by prescribing medication, providing constant observation, and transferring inmates and detainees, if necessary, to a facility equipped with such providers;

(f)    A policy, custom, or practice of prematurely removing detainees or inmates from suicide watch;

(g)    A policy, custom, or practice of lowering and/or downgrading the frequency or intensity of a suicide watch, including during the period immediately after the watch is removed, contrary to prevailing medical and mental health standards;

(h)    A policy, custom, or practice of housing mental health patients in cells that pose risks to inmate and detainee health and safety, including cells with ligature points;

(i)    A policy, custom, or practice of conducting improper or incomplete screening before admitting or booking individuals into the Yamhill County Jail;

(j) A policy, custom, or practice of providing insufficient medical coverage at the Yamhill County Jail;

(k) A policy, custom, or practice of failing to ensure employees of Yamhill County and Wellpath were properly trained to recognize and address the mental health needs of inmates and detainees;

(l) A policy, custom, or practice of failing to meet widely accepted community standards of care with regard to medical and mental health services for Jail inmates and detainees; and

(m) A policy, custom, or practice of relying on inadequately trained Jail staff to conduct medical monitoring of inmates and detainees.

91. The policies of Defendants Wellpath and Yamhill County posed a substantial risk of harm to Yamhill County inmates and detainees. Wellpath and Yamhill County were long aware of the risk.

92. As a direct result of the policies, customs, or practices of Wellpath and Yamhill County set forth above, Rader was delayed access to timely and necessary medical and mental health care and treatment. As a direct result of the policies, customs, or practices of Wellpath and Yamhill County, Rader endured and suffered severe physical, emotional, and mental distress, his medical condition worsened, and he died by suicide. Rader's children have been denied his love, society, and companionship. Rader's estate incurred medical expenses and funeral expenses. Rader's estate is entitled to compensatory damages in an amount the jury determines is appropriate.

93. Defendant Wellpath's actions were recklessly and callously indifferent to Rader's rights and physical safety. Punitive damages should be awarded in an amount the jury

determines is appropriate.

94.     Plaintiff is entitled to her necessary and reasonable attorneys' fees and costs incurred in the prosecution of this action.

### THIRD CLAIM FOR RELIEF
Delay and Denial of Essential Medical Care – Supervisory Liability
42 U.S.C. § 1983 – 8th and 14th Amendments

95.     Plaintiff realleges and incorporates, as though fully set forth herein, all previous paragraphs above.

96.     Defendant Petrasek and John Doe Defendants 6–10 were supervisors of Wellpath employees at the time of the events alleged herein, and Defendants Svenson, Ruby, and Geist were at all relevant times supervisors of Yamhill County Jail employees.  Collectively, they are referred to herein as the Supervisory Defendants.

97.     The Supervisory Defendants oversaw the operations of Wellpath and the Yamhill County Jail and had a duty to ensure that subordinate staff followed all applicable policies, rules, medical standards, and legal parameters, and had a further duty to change or update policies when changes became necessary.  The Supervisory Defendants failed to adequately train and supervise their subordinate staff.  As a result of their failures to supervise, the Supervisory Defendants were deliberately indifferent to Shane Rader's serious medical needs and his rights under the Eighth and Fourteenth Amendments of the U.S. Constitution in one or more of the following particulars:

> (a)     In continuing to allow Wellpath and Yamhill County to rely on remote video monitoring of inmates and detainees, including those with a known risk of harm to self or others;
>
> (b)     In failing to ensure that staffing levels in the Yamhill County Jail Control

Room were sufficient to adequately monitor inmates and detainees, including those with serious medical and mental health needs;

(c)     In failing to ensure the coordination of care between medical providers, mental health providers, and Jail staff;

(d)     In failing to ensure the coordination of care between county mental health providers, medical providers, and Jail staff, including by failing to provide for mechanisms through which to escalate as necessary and appropriate the level of medical or mental health treatment to meet the needs inmates and detainees;

(e)     In failing to ensure that inmates and detainees have access to qualified medical and mental health providers able to treat serious medical conditions, including by prescribing medication, providing constant observation, and transferring inmates and detainees, if necessary, to a facility equipped with such providers;

(f)     In allowing subordinate staff to prematurely remove detainees or inmates from suicide watch;

(g)     In allowing the frequency or intensity of a suicide watch, including during the period immediately after the watch is removed, to be lowered and/or downgraded contrary to prevailing medical and mental health standards;

(h)     In allowing mental health patients to be housed in cells that pose risks to inmate and detainee health and safety, including cells with hanging or ligature points;

(i)     In failing to ensure the proper or complete screening of individuals who

are booked into the Yamhill County Jail;

(j)     In failing to provide sufficient medical coverage at the Yamhill County
        Jail;

(k)     In failing to ensure that employees of Yamhill County and Wellpath were
        properly trained to recognize and address the mental health needs of
        inmates and detainees;

(l)     In failing to ensure that the policies and practices then-existing at the
        Yamhill County Jail met widely accepted community standards of care
        with regard to medical and mental health services for jail inmates and
        detainees;

(m)     In relying on inadequately trained jail staff to conduct medical monitoring
        of inmates and detainees;

(n)     In failing to respond to obvious and ongoing deficiencies in Defendants'
        policies of remotely monitoring inmates and detainees; and

(o)     In failing to ensure constitutionally adequate monitoring of inmates and
        detainees, particularly those with serious medical or mental health needs.

98.    As a direct result of the actions and inactions of the Supervisory Defendants as set
forth above, Rader endured and suffered severe physical, emotional, and mental distress, his
medical condition was exacerbated, and he died by suicide.  Rader's children, the beneficiaries
of the estate, have been denied his love, society, and companionship.  Rader's estate incurred
medical expenses and funeral expenses.  Rader's estate is entitled to compensatory damages in
an amount the jury determines is appropriate.

99.    The actions of defendants Petrasek, Svenson, Ruby, Geist, and John Does 6–10

were recklessly and callously indifferent to Rader's rights and physical safety. Punitive damages should be awarded in an amount the jury determines is appropriate.

100.    Plaintiff is entitled to her necessary and reasonable attorneys' fees and costs incurred in the prosecution of this action.

**FOURTH CLAIM FOR RELIEF**
Negligence

101.    Plaintiff realleges and incorporates all previous paragraphs as if fully set forth herein.

102.    The actions of defendants Yamhill County and Wellpath, acting by and through their employees and agents, were negligent in one or more of the following particulars:

(a)    In failing to properly and fully screen Rader at the time that he was admitted to the Yamhill County Jail;

(b)    In failing to provide Rader with proper and competent medical and mental health care and treatment for his serious medical condition;

(c)    In failing to recognize that Rader was not medically stable, was in need of mental health treatment, and was a risk to himself and/or others;

(d)    In failing to prepare an adequate safety plan in the circumstances of Rader's risk of danger to himself and others;

(e)    In placing Rader in a cell that had a bunk with a hole that could be used as a ligature or hanging point and therefore presented a risk of serious harm;

(f)    In failing to adequately monitor Rader in his cell;

(g)    In relying on remote video monitoring when in-person monitoring was medically necessary and appropriate;

(h)    In failing to conduct regular in-person checks on Rader in less than 15-

minute intervals;

(i)     In failing to coordinate care between county mental health providers,
        medical providers, and Jail staff, including by failing to provide
        mechanisms through which to escalate the level of medical or mental
        health treatment necessary and appropriate for Rader's medical needs;

(j)     In failing to ensure that Rader received access to qualified medical and
        mental health providers able to treat his condition, including by
        prescribing medication, providing constant observation, and transferring
        Rader, if necessary, to a facility equipped with such providers;

(k)     In operating the Jail, including the Control Room and the Jail's holding
        cells, with staffing levels insufficient to adequately monitor, observe, and
        treat inmates and detainees with serious medical and mental health
        conditions;

(l)     In failing to respond to Rader's medical emergency with timely, lifesaving
        efforts;

(m)     In continuing to allow Wellpath and Yamhill County to rely on remote
        video monitoring of inmates and detainees, including those with a known
        risk of harm to self or others;

(n)     In failing to ensure that staffing levels in the Yamhill County Jail Control
        Room were sufficient to adequately monitor inmates and detainees,
        including those with serious medical and mental health needs;

(o)     In failing to ensure the coordination of care between county mental health
        providers, medical providers, and jail staff, including by failing to provide

mechanisms through which to escalate as necessary and appropriate the level of medical or mental health treatment to meet the needs inmates and detainees;

(p)     In failing to ensure that inmates and detainees have access to qualified medical and mental health providers able to treat serious medical conditions, including by prescribing medication, providing constant observation, and transferring inmates and detainees, if necessary, to a facility equipped with such providers;

(q)     In allowing subordinate staff to prematurely remove detainees or inmates from suicide watch;

(r)     In allowing the frequency or intensity of a suicide watch, including during the period immediately after the watch is removed, to be lowered and/or downgraded contrary to prevailing medical and mental health standards;

(s)     In allowing mental health patients to be housed in cells that pose risks to inmate and detainee health and safety, including cells with hanging or ligature points;

(t)     In failing to provide sufficient medical coverage at the Yamhill County Jail;

(u)     In failing to ensure employees of Yamhill County and Wellpath were properly trained to recognize and address the mental health needs of inmates and detainees;

(v)     In failing to ensure that the policies and practices then-existing at the Yamhill County Jail meet widely accepted community standards of care

with regard to medical and mental health services for jail inmates and

detainees;

(w)    In relying on inadequately trained jail staff to conduct medical monitoring

of inmates and detainees;

(x)    In failing to respond to obvious and ongoing deficiencies in Defendants'

policies of remotely monitoring inmates and detainees; and

(y)    In failing to ensure constitutionally adequate monitoring of inmates and

detainees, particularly those with serious medical or mental health needs.

103.    As a direct result of the actions and inactions of Defendants, and each of them,

Rader endured and suffered severe physical, emotional, and mental distress, his medical

condition was exacerbated, and he died by suicide.  Rader's children have been denied his love,

society, and companionship.  Rader's estate incurred medical expenses and funeral expenses.

Rader's estate is entitled to compensatory damages in an amount the jury determines is

appropriate.

104.    Notice pursuant to the Oregon Tort Claims Act was provided to Defendant

Yamhill County within the time prescribed by law.

### FIFTH CLAIM FOR RELIEF
Gross Negligence

105.    Plaintiff realleges and incorporates all previous paragraphs as if fully set forth

herein.

106.    Defendant Wellpath, by and through its employees acting within the scope of

their employment, was grossly negligent and acted with reckless misconduct in one or more of

the following particulars:

(a)    In failing to properly and fully screen Rader at the time that he was

admitted to the Yamhill County Jail;

(b)    In failing to provide Rader with proper and competent medical and mental

health care and treatment for his serious medical condition;

(c)    In failing to recognize that Rader was not medically stable, was in need of

mental health treatment, and was a risk to himself and/or others;

(d)    In failing to prepare an adequate safety plan in the circumstances of

Rader's risk of danger to himself and others;

(e)    In placing Rader in a cell that had a bunk with a hole that could be used as

a ligature or hanging point and therefore presented a risk of serious harm;

(f)    In failing to adequately monitor Rader in his cell;

(g)    In relying on remote video monitoring when in-person monitoring was

medically necessary and appropriate;

(h)    In failing to conduct regular in-person checks on Rader in less than 15-

minute intervals;

(i)    In failing to coordinate care between county mental health providers,

medical providers, and Jail staff, including by failing to provide

mechanisms through which to escalate the level of medical or mental

health treatment necessary and appropriate for Rader's medical needs;

(j)    In failing to ensure that Rader received access to qualified medical and

mental health providers able to treat his condition, including by

prescribing medication, providing constant observation, and transferring

Rader, if necessary, to a facility equipped with such providers;

(k)    In operating the Jail, including the Control Room and the Jail's holding

cells, with staffing levels insufficient to adequately monitor, observe, and treat inmates and detainees with serious medical and mental health conditions; and

(l)    In failing to respond to Rader's medical emergency with timely, lifesaving efforts.

(m)    In continuing to allow Wellpath and Yamhill County to rely on remote video monitoring of inmates and detainees, including those with a known risk of harm to self or others;

(n)    In failing to ensure that staffing levels in the Yamhill County Jail Control Room were sufficient to adequately monitor inmates and detainees, including those with serious medical and mental health needs;

(o)    In failing to ensure the coordination of care between county mental health providers, medical providers, and jail staff, including by failing to provide mechanisms through which to escalate as necessary and appropriate the level of medical or mental health treatment to meet the needs inmates and detainees;

(p)    In failing to ensure that inmates and detainees have access to qualified medical and mental health providers able to treat serious medical conditions, including by prescribing medication, providing constant observation, and transferring inmates and detainees, if necessary, to a facility equipped with such providers;

(q)    In allowing subordinate staff to prematurely remove detainees or inmates from suicide watch;

(r)    In allowing the frequency or intensity of a suicide watch, including during the period immediately after the watch is removed, to be lowered and/or downgraded contrary to prevailing medical and mental health standards;

(s)    In allowing mental health patients to be housed in cells that pose risks to inmate and detainee health and safety, including cells with hanging or ligature points;

(t)    In failing to provide sufficient medical coverage at the Yamhill County Jail;

(u)    In failing to ensure employees of Yamhill County and Wellpath were properly trained to recognize and address the mental health needs of inmates and detainees;

(v)    In failing to ensure that the policies and practices then-existing at the Yamhill County Jail met widely accepted community standards of care with regard to medical and mental health services for inmates and detainees;

(w)    In relying on inadequately trained Jail staff to conduct medical monitoring of inmates and detainees;

(x)    In failing to respond to obvious and ongoing deficiencies in Defendants' policies of remotely monitoring inmates and detainees; and

(y)    In failing to ensure constitutionally adequate monitoring of inmates and detainees, particularly those with serious medical or mental health needs.

107.    As a direct result of the misconduct of Defendant Wellpath, Shane Rader endured and suffered severe physical, emotional, and mental distress, his medical condition worsened,

and he died by suicide.  Rader's children, the beneficiaries of his estate, have been denied his

love, society, and companionship.  Rader's estate incurred medical expenses and funeral

expenses.  Rader's estate is entitled to compensatory damages in an amount the jury determines

is appropriate.

108.    The actions of Defendant Wellpath were grossly negligent and recklessly and

callously indifferent to Rader's rights and physical safety.  Punitive damages should be awarded

in an amount the jury determines is appropriate.

### PRAYER CLAIM FOR RELIEF

Plaintiff prays for judgment as follows:

**On the First Claim for Relief**, for judgment against Defendants Svenson, Ruby, Geist,

Hart, Hart, Sanzano, Spencer, and John Does 1–5, and each of them, for compensatory damages

in whatever amount the jury determines is appropriate, for punitive damages in whatever amount

the jury determines is appropriate, and for necessarily and reasonably incurred attorneys' fees

and costs;

**On the Second Claim for Relief**, for judgment against Defendants Wellpath and

Yamhill County, and each of them, for compensatory damages in whatever amount the jury

determines is appropriate, and for punitive damages against Defendant Wellpath in whatever

amount the jury determines is appropriate, and for necessarily and reasonably incurred attorneys'

fees and costs;

**On the Third Claim for Relief**, for judgment against Defendants Petrasek, Svenson,

Ruby, Geist, and John Does 6–10,  and each of them, for compensatory damages in whatever

amount the jury determines is appropriate, for punitive damages against defendants Petrasek,

Svenson, Ruby, Geist, and John Does 6–10, in whatever amount the jury determines is

appropriate, and for necessarily and reasonably incurred attorneys' fees and costs;

**On the Fourth Claim for Relief,** for judgment against defendants Wellpath and Yamhill County, and each of them, for compensatory damages in whatever amount the jury determines is appropriate and for punitive damages against Defendant Wellpath in whatever amount the jury determines is appropriate; and

**On the Fifth Claim for Relief,** for judgment against Defendant Wellpath, for compensatory damages in whatever amount the jury determines is appropriate, and for punitive damages in whatever amount the jury determines is appropriate.

DATED this June 22, 2023.

> **Matthew D. Kaplan**, OSB No. 980699
> KAPLAN LAW, LLC
> 50 SW Pine Street, Suite 302
> Portland, Oregon 97204
> T: (503) 226-3844
> E: matthew@mdkaplanlaw.com
>
> /s/ Nadia H. Dahab
> **Nadia Dahab**, OSB No. 125630
> SUGERMAN DAHAB
> 707 SW Washington St., Ste. 600
> Portland, OR 97205
> T: (503) 228-6474
> E: nadia@sugermandahab.com

PLAINTIFF DEMANDS A TRIAL BY JURY.

> /s/ Nadia H. Dahab
> **Nadia Dahab**, OSB No. 125630
> SUGERMAN DAHAB
> 707 SW Washington St., Ste. 600
> Portland, OR 97205
> T: (503) 228-6474
> E: nadia@sugermandahab.com