IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **RENEE WARREN,** Personal Representative of the ESTATE OF SHANE EARL RADER, Deceased,<br><br>        Plaintiff,<br><br>      v.<br><br>**YAMHILL COUNTY**, an Oregon County; **TIM SVENSON**, an individual; **MICHAEL PETRASEK**, an individual; **JEREMY RUBY**, an individual; **RICHARD GEIST**, an individual; **TAMARA HART**, an individual; **TONI SANZANO**, an individual; **AUDREY SPENCER**, an individual; **WELLPATH, LLC**, a Delaware corporation; and **JOHN DOES 1-10**,<br><br>        Defendants. | Case No. 3:23-cv-911-SI<br><br>**OPINION AND ORDER** |

Matthew D. Kaplan, KAPLAN LAW, LLC. 50 SW Pine Street, Suite 302, Portland, Oregon 97204. Nadia Dahab, SUGERMAN AND DAHAB. 707 SW Washington Street, Suite 600, Portland, OR 97205. Of Attorneys for Plaintiff.

Jonathan D. Ballard and Ross C. Taylor, FOX BALLARD PLLC. 1325 Fourth Avenue, Suite 1500, Seattle, WA 98101. Of Attorneys for Defendant Wellpath, LLC and Nurse Michael Petrasek.

Lauren E. Nweze, William E. Stabler, & David C. Lewis, LEWIS, NEWEZE & STABLER. 15875 Boones Ferry Road, #1469, Lake Oswego, OR 97035. Of Attorneys for Yamhill County, Tim Svenson, Tamara Hart, Toni Sanzano, and Audrey Spencer.

Robert E. Franz, Jr. & Sarah R. Henderson, LAW OFFICE OF ROBERT E. FRANZ, JR. 730 B Street, P.O. Box 62, Springfield, OR 97477. Of Attorneys for Richard Geist.

PAGE 1 – OPINION AND ORDER

**Michael H. Simon, District Judge.**

Plaintiff Renee Warren brings claims as the personal representative for the estate of Shane Earl Rader (Rader), who died in the Yamhill County Jail (Jail). Plaintiff alleges several constitutional violations against Yamhill County (County) and its employees, and Wellpath, LLC (Wellpath), Registered Nurse (RN) Michael Petrasek, and John Does 6-10 (collectively, the Wellpath Defendants). The Wellpath Defendants move to dismiss the claims against them, arguing that Plaintiff fails to state a claim. For the reasons stated below, the Court grants that motion.

## STANDARDS

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The court must draw all reasonable inferences from the factual allegations in favor of the plaintiff. *Newcal Indus. v. Ikon Office Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit a plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

PAGE 2 – OPINION AND ORDER

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epsten Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation marks omitted). If a party alleges alternative theories, the pleading is sufficient—for the purposes of a motion to dismiss—if "any one of the [theories] is sufficient." *FT Travel–New York, LLC v. Your Travel Ctr., Inc.*, 112 F. Supp. 3d 1063, 1073 (C.D. Cal. 2015) (quoting Fed. R. Civ. P. 8(d)(2)).

## BACKGROUND

### A. Rader's Time at the Jail

On June 15, 2021, Rader was arrested by the Newberg-Dundee Police Department and processed into the Jail. During his booking, he stated that he had planned to kill his family and himself that day, and that he had a history of suicide attempts and suicidal ideations. Rader was placed on suicide watch and held in a medical cell. An emergency medical technician (EMT), not identified as being from Wellpath or the County, documented a failed attempt to perform a physical screening of Rader. This person noted that the screening was not completed because Rader was "on suicide watch, mentally unstable, for safety reasons will try again."

On June 16, 2021, Rader was seen for several minutes by County employee Defendant Qualified Mental Health Professional (QMHP) Toni Sanzano. Sanzano continued Rader's suicide watch and diagnosed him with an intellectual disability.

PAGE 3 – OPINION AND ORDER

On June 17th, Rader was evaluated for several minutes by County employee Defendant QMPH Audrey Spencer. Spencer found Rader's judgment and insight to be poor, his speech disjointed, and that he had "poor cause and effect relationships in thought content." She also agreed with the diagnosis that he had an intellectual disability. Because he denied having suicidal ideation, however, Spencer removed Rader from suicide watch and placed him in a video camera-monitored segregation observation cell. She approved a safety plan where Rader promised to press the intercom button if his suicidal ideation returned. County employee Defendant Jeremy Ruby agreed with Spencer's assessment and plan. Jail staff, however, requested that mental health providers continue to conduct daily checks on Rader.

From June 18-21, 2021, either Sanzano or Spencer visited Rader once per day. On June 25, 2021, Spencer noted that "post-suicide watch precautions" were complete for Rader. There is no record of any Wellpath medical personnel checking on Rader from June 18-28.

On June 28th, Wellpath RN Maria Spear tried to perform a physical exam on Rader, but Rader refused the exam. Neither Rader nor a witness signed a refusal document, even though a signature by Rader or a witness was required by Jail policy. On June 29th, Rader died by suicide in his jail cell. After significant time passed with the Jail deputy monitoring the cameras not responding to Rader's visible condition and distress on camera, help was sent but lifesaving efforts by Jail staff, Wellpath staff, and paramedics did not succeed.

**B. National Commission on Correctional Health Care Standards**

The National Commission on Correctional Health Care (NCCHC) publishes a set of standards for health services in jails (NCCHC Standards). Wellpath's medical care and services at the Jail are subject to these standards.

The fundamental principle of the NCCHC Standards is that "[i]nmates must have access to care to meet their serious health needs." ECF 1 ¶ 23. There may be "unreasonable barriers" to

PAGE 4 – OPINION AND ORDER

health services, including having a health service system that is understaffed, underfunded, or poorly organized, with "the result that it is not able to provide appropriate and timely access to care." *Id.* More specific to the events here, it is "essential" that "[s]uicides are prevented when possible by implementing prevention efforts and intervention." *Id.* ¶ 24. This standard also requires that "[t]he responsible health authority and facility administrator approve the facility's suicide prevention program." *Id.* There are also standards requiring medical and mental health screening for medical clearance when individuals are booked into the jail. Medical clearance means "a documented clinical assessment of medical, dental, and mental status before an individual is admitted into the facility" *Id.* ¶ 25 (NCCHC Standard J-E-02). The standards encourage training for intake screening so that nonmedical health professionals know how to screen "mentally unstable" individuals. *Id.*

## C. Wellpath

In March 2017, Wellpath contracted with the County to provide medical care to persons in custody at the Jail. The contract required Wellpath to identify individuals in the Jail who had medical or mental health conditions that required specific care while incarcerated.

Plaintiff includes in her complaint a litany of instances, unrelated to Rader, where she alleges that Wellpath was deliberately indifferent to the needs of individuals in custody in institutions across the country where Wellpath was the medical and mental health provider. Plaintiff also alleges that the Jail has "an alarming" history of in-custody deaths and incidents that she alleges amount to "consistent failures to follow policies" relating to monitoring and providing medical care to persons in custody.

## DISCUSSION

The Wellpath Defendants argue that Plaintiff's claims fail because: (A) for Plaintiff's claims under 42 U.S.C. § 1983 alleging violations of Rader's 14th Amendment rights, Plaintiff

PAGE 5 – OPINION AND ORDER

does not adequately allege a policy or custom *by Wellpath* as required to plausibly allege liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978); (B) Plaintiff does not allege facts relating to RN Petrasek and the Doe Defendants sufficient to state a claim for supervisory liability; (C) Plaintiff's negligence claim is duplicative of Plaintiff's claim under § 983 and improperly seeks to hold a healthcare entity directly liable outside the acceptable boundaries of Oregon law; and (D) Plaintiff's gross negligence claim is duplicative of Plaintiff's claim under § 1983 and fails to allege the requisite state of mind. The Court addresses each argument in turn.

**A. Section 1983 *Monell* Deliberate Indifference Claim Against Wellpath**

Plaintiff's second claim for relief asserts a § 1983 *Monell* claim against Wellpath. Plaintiff alleges *Monell* liability under a theory that Wellpath was deliberately indifferent to Rader's serious medical needs by adhering or failing to adhere to several policies, customs, and practices.[1]

**1. Applicable Law**

Section 1983 provides "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage of any State" who "subjects, or causes to be subjected" any person within the jurisdiction of the United States the "deprivation of any rights, privileges, or immunities secured by the Constitution and the laws, shall be liable to the party injured." 42 U.S.C. § 1983. Although a municipality or other local government is a "person" who may be sued under § 1983, *Duarte v. City of Stockton*, 60 F.4th 566, 568 (9th Cir. 2023), it may not be held liable "for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc.*

---

[1] In Plaintiff's response to Wellpath's motion to dismiss, she clarifies that certain policies only apply to the County and its employees. For Wellpath's motion to dismiss, the Court addresses only those claims Plaintiff clarifies apply to Wellpath.

*Servs.*, 436 U.S. 658, 694 (1978). In other words, § 1983 does not allow recovery for the actions of a local government's employees under a theory of *respondeat superior* liability. *Id.* at 691. Instead, a plaintiff must demonstrate that a municipality had a "policy" that was the "moving force" behind a violation of the plaintiff's constitutional rights. *See Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013); *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

To meet the "moving force" requirement, "the plaintiff must show both causation-in-fact and proximate causation." *Gravelet-Blondin*, 728 F.3d at 1096. A plaintiff can demonstrate causation-in-fact "only if the injury would not have occurred 'but for' [the defendant's] conduct." *Chaudhry v. Aragón*, 68 F.4th 1161, 1169 n.11 (9th Cir. 2023) (quoting *White v. Roper*, 901 F.2d 1501, 1505 (9th Cir. 1990)). In the context of *Monell* liability, a plaintiff can meet this burden by "establish[ing] that the injury would have been avoided had proper policies been implemented." *Long v. County of Los Angeles*, 442 F.3d 1178, 1190 (9th Cir. 2006) (quotation marks omitted). To demonstrate proximate causation, a plaintiff must establish that any "intervening actions were within the scope of the original risk and therefore foreseeable." *Van Ort v. Est. of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996) (quoting *Dodd v. City of Norwich*, 827 F.2d 1, 6 (2d Cir. 1987)).

"A 'policy' is a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (cleaned up). A plaintiff can show a "policy," as that term is used for *Monell* liability, "in one of three ways." *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 883 (9th Cir. 2022).

> First, the [municipality] may be held liable if it acted pursuant to
> an expressly adopted official policy. Second, the [municipality]

PAGE 7 – OPINION AND ORDER

> may be held liable based on a longstanding practice or custom. Third, the [municipality] may be held liable if the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it.

*Id.* (quotation marks and citations omitted); *see also Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."); *Gordon v. County of Orange*, 6 F.4th 961, 973-74 (9th Cir. 2021) (describing the three ways "[a] plaintiff can satisfy *Monell's* policy requirement").

The Ninth Circuit recognizes that a local government body can be held liable under § 1983 for "policies" of inaction or omission. Some cases, generally older decisions, refer to this as a separate "path" to liability distinct from the "direct path" of the municipality *itself* violating the plaintiff's rights or directing its employees to do so.[2] *See Gibson v. County of Washoe*, 290 F.3d 1175, 1185 (9th Cir. 2002), *overruled on other grounds by Castro v. County. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016); *see also Tsao*, 698 F.3d at 1144. In this separate path to liability, a municipality can be held responsible "for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation." *Gibson*, 290 F.3d at 1185; *see also Tsao*, 698 F.3d at 1143; *Hyun Ju Park v. City & County of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020). More recent cases, however, generally describe claims for such

---

[2] "Under [the] 'direct path' to municipal liability, a plaintiff must prove that the municipality acted with the state of mind required to prove the underlying violation, just as a plaintiff does when he or she alleges that a natural person has violated his federal rights." *Tsao*, 698 F.3d at 1144.

PAGE 8 – OPINION AND ORDER

policies of inaction or omission as a type of custom or practice claim. *See, e.g.*, *Sabra*, 44 F.4th at 884; *Gordon*, 6 F.4th at 973. Regardless of how such claims are categorized, the Ninth Circuit is consistent in describing the heightened requirements that a plaintiff must show to prove a violation based on inaction or omission to avoid imposing *respondeat superior* liability.

A policy of inaction or omission may be based on a government body's "failure to implement procedural safeguards to prevent constitutional violations." *Tsao*, 698 F.3d at 1143; *see also Sabra*, 44 F.4th at 884. A plaintiff who alleges a policy of inaction, however, must establish that such a policy amounts to deliberate indifference to the plaintiff's constitutional rights. *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997); *Park*, 952 F.3d at 1141; *see also Oviatt ex rel. Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) ("To impose liability on a local governmental entity for failing to act to preserve constitutional rights, a section 1983 plaintiff must establish: (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation." (quotation marks omitted)).

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (cleaned up). "Deliberate indifference exists when the need for more or different action is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *Park*, 952 F.3d at 1141 (cleaned up). "This requires a showing that the facts available to the [municipality] put it on actual or constructive notice that its practices . . . were substantially certain to result in the violation of the constitutional rights of its citizens."

*Sandoval v. County of San Diego*, 985 F.3d 657, 682 (9th Cir. 2021) (cleaned up). Deliberate indifference ordinarily is shown through "a pattern of prior, similar violations of federally protected rights, of which the relevant policymakers had actual or constructive notice." *Park*, 952 F.3d at 1142. Deliberate indifference also may be shown if a policy is "so facially deficient that any reasonable policymaker would recognize the need to take action." *Id.* at 1141.

Under narrow circumstances, a municipality's failure to train its employees may be considered a policy or custom. *See Canton*, 489 U.S. at 389. "Failure to train may constitute a basis for *Monell* liability where the failure amounts to deliberate indifference to the rights of those who deal with municipal employees." *Benavidez v. County of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021) (citing *Canton*, 489 U.S. at 388-89). Under a failure-to-train theory, a plaintiff must allege "sufficient facts to support a reasonable inference (1) of a constitutional violation; (2) of a municipal training policy that amounts to a deliberate indifference to constitutional rights; and (3) that the constitutional injury would not have resulted if the municipality properly trained their employees." *Id.* at 1153-54. "A [municipality's] failure adequately to train its employees to implement a facially valid policy can amount to deliberate indifference." *Long*, 442 F.3d at 1188. "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (quoting *Brown*, 520 U.S. at 409). Absent a pattern of similar violations, failure to train "may amount to a policy of deliberate indifference if the need to train was obvious and the failure to do so made a violation of constitutional rights likely." *See Dougherty*, 654 F.3d at 900 (quotation marks omitted).

### 2. Application

Rader had a clearly established, constitutional right to adequate medical care under the Fourteenth Amendment. *See Sandoval v. County of San Diego*, 985 F.3d 657, 667 (9th

PAGE 10 – OPINION AND ORDER

Cir. 2021). Plaintiff contends this right was violated by several of Wellpath's policies or customs. Plaintiff does not identify any express policies. Plaintiff appears to bring her claims based on policies or customs of inaction, policies based on longstanding custom or practice, and failure to train.[3]

Wellpath argues that the Complaint conflates Wellpath and the County and does not sufficiently articulate whether *Wellpath* had a violating policy. In her response, Plaintiff clarifies that the following alleged policies are directed against Wellpath: (1) a policy of Wellpath improperly relying on video monitoring; (2) a policy of Wellpath and the County failing to coordinate care between medical providers, mental health professionals, and Jail staff; (3) a policy of failing to provide inmates and detainees access to medical and mental health providers qualified to treat serious medical conditions, including prescribing appropriate medications; (4) a policy of prematurely removing detainees from suicide watch and of lowering or downgrading inmates on suicide watch; (5) a policy of housing mental health patients, including Rader, in cells that pose a risk to safety; (6) a policy of performing improper and incomplete screening before admitting or booking individuals into the Jail; (7) a policy of providing insufficient medical coverage at the Jail; (8) a policy of failing to meet widely accepted community standards of care for providing medical services to individuals in custody; and (9) a series of policies related to insufficient County and Wellpath employee training on mental health needs and insufficient training for medical staff.

Wellpath also argues that Plaintiff's alleged violations focus on Rader's *mental health treatment* and that Plaintiff alleges that Wellpath provided *medical* treatment at the Jail. Wellpath

---

[3] For simplicity, the Court references Plaintiff as challenging Wellpath's "policy" or "policies."

contends that Plaintiff fails to allege how Rader's *medical*, rather than *mental health* treatment, supports the conclusion that Wellpath had policies that were deliberately indifferent or contributed to Rader's death.

The Court agrees that Plaintiff alleges only that Wellpath provides medical, as distinguished from mental health, treatment. In paragraph 21 of the Complaint, Plaintiff alleges that Wellpath was contracted in 2017 to provide "medical care" to pretrial detainees at the Jail. This contrasts with Plaintiff's allegations in paragraphs 70-73, 76, and 78-80, which describe Wellpath as providing "medical and mental health care" at other facilities. Plaintiff alleges that Wellpath promised that its healthcare services at the Jail would comply with the NCCHC Standards, and recites several of these standards applicable to mental health care. Plaintiff fails, however, to allege a connection between those mental health standards and a provider who is responsible only for *medical* care, and not mental health care.

Plaintiff does not allege facts showing the required causal connection between Rader's suicide and Wellpath's medical treatment (or lack thereof). For example, Plaintiff does not allege that Wellpath's medical services included a psychiatrist or medical doctor who could prescribe medication (such as an antidepressant or antipsychotic), or facts supporting that such treatment could have helped Rader in his first 14 days of incarceration or avoided his suicide. Nor does Plaintiff allege any connection between Wellpath's alleged failure to conduct an early medical screening of Rader and his suicide, or facts showing that Wellpath had any influence on or responsibility for placing inmates on or removing inmates from suicide watch or in certain cells. Plaintiff does not allege facts supporting a causal link between *Wellpath's* alleged general policies, such as medical video monitoring or failing to provide sufficient medical services, and Rader's suicide. Instead, the facts alleged by Plaintiff show that Rader's suicide was due to the

County's alleged conduct and policies, such as the decision to place Rader in a video-monitored cell, the decision to remove him from suicide watch, and the Jail deputy's failure to react to Rader's visible distress. These facts fail to state a claim against Wellpath.

Plaintiff also alleges general policies about Wellpath's treatment of inmates, such as that Wellpath has a policy of performing improper and incomplete medical screenings, but in addition to failing to allege a causal link, Plaintiff does not allege any other similar instances at the Jail. A single incident generally does not support a claim of longstanding custom or practice. *See Saved Mag. v. Spokane Police Dep't*, 19 F.4th 1193, 1201 (9th Cir. 2021) ("Plaintiffs' allegations amount to no more than an isolated or sporadic incident that cannot form the basis of *Monell* liability for an improper custom." (cleaned up)); *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999) (stating that a "single constitutional deprivation ordinarily is insufficient to establish a longstanding practice or custom"); *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."). Although Plaintiff alleges other instances of in-custody suicides, Plaintiff does not allege other instances of incomplete screenings.

Finally, Plaintiff alleges a series of policies related to insufficient County and Wellpath employee training on mental health needs and insufficient training for medical staff. Plaintiff does not describe how Wellpath's training of its own employees fell short nor why Wellpath would be responsible for training County employees or for training on mental health services. Plaintiff thus fails sufficiently to allege that Wellpath disregarded the "known or obvious consequence" of failing to train employees as it relates to the harm suffered by Rader. Nor does Plaintiff allege a pattern or practice involving Wellpath's provision of *medical* services that

resulted in similar harm, as compared to the provision of *mental health* services, for which the County was allegedly responsible. Plaintiff also does not allege facts showing how Wellpath's alleged failure to train its employees caused a violation of Rader's constitutional rights. Instead, Plaintiff points to Wellpath's reliance on the County's video monitoring of inmates. This allegation, however, does not implicate Wellpath's alleged failure to train its employees.

## B.  Supervisory Liability Claim

As noted, there is no *respondeat superior* liability under § 1983. A supervisor may be liable for his or her conduct under § 1983 "only upon a showing of personal participation by the defendant. A supervisor is only liable for constitutional violations of his [or her] subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citation omitted).

Collectively, the Wellpath Defendants[4] argue that because there is no *respondeat superior* liability under § 1983, they cannot be liable and they could not have acted with deliberate indifference because they were not sufficiently involved in the County policies that allegedly led to Rader's death. They also argue that because Plaintiffs fail to sufficiently allege any underlying constitutional violation, there can be no supervisory violation. In response, Plaintiff argues that because RN Petrasek was both a nurse and a Health Services Administrator

---

[4] Although Does 6-10 remain unidentified, Wellpath treats them as Wellpath employees in its motion to dismiss and moves for dismissal on their behalf. Plaintiff contends that the claims against these Doe defendants should not be dismissed because the Ninth Circuit allows Plaintiff an opportunity to identify unknown defendants through discovery, "unless it is clear discovery would not uncover the identities or that the complaint would be dismissed on other grounds." *See Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980). Because Plaintiff has failed to link allegations about Wellpath or Wellpath's alleged policies to Rader's harm or deliberate indifference to Rader, the complaint is dismissed on other grounds, regardless of the identities of additional Wellpath employees or supervisors.

PAGE 14 – OPINION AND ORDER

at the Jail, he was at least partially responsible for implementing Wellpath's policies and procedures at the Jail.

As the Court has discussed, Plaintiffs fail to allege sufficient facts showing that Wellpath, as the Jail's medical provider, had any policy that caused a violation of Rader's constitutional rights. Thus, the same deficiency applies to Plaintiff's allegations regarding any policies that RN Petrasek was responsible for implementing and ensuring that employees followed.

## C. Negligence Claim

Plaintiff alleges that Wellpath was negligent in the events leading up to Rader's suicide. Plaintiff alleges that Wellpath—as a professional entity—did not provide medical care to the appropriate standard. Wellpath argues that Plaintiff fails to state a claim for negligence.[5] Wellpath contends that the complaint alleges only negligent direct care (e.g., failing to medically screen Rader upon admission to the Jail), or negligent mental health care, not medical care failures. The Court agrees.

The complaint does contain some conclusory allegations, such as that Wellpath failed to train employees to provide adequate medical care. There are no alleged facts, however, about the medical care that was needed or lacking, the medical care that could have avoided Rader's suicide, or otherwise connecting medical care to the harm alleged in this case. Plaintiff relies on

---

[5] Wellpath argued in its opening brief that this claim was duplicative of Plaintiffs' § 1983 *Monell* claim, relying on cases involving Fourth Amendment excessive force claims. Plaintiff explained why those cases are distinguishable and should not be extended to this context. In its reply, Wellpath did not respond to Plaintiff's argument, thereby abandoning this challenge to Plaintiff's claim. *See Palmer v. Cognizant Tech. Sols. Corp.*, 2022 WL 18214014, at *31 (C.D. Cal. Oct. 27, 2022) ("Plaintiffs do not respond to this contention in their Reply, which constitutes a concession of that argument."); *Nguyen v. Nissan N. Am., Inc.*, 487 F. Supp. 3d 845, 857 (N.D. Cal. 2020) (concluding that the party's failure to address counterarguments in reply constituted abandonment of position taken in initial brief). Even if Wellpath did not abandon this argument, for the reasons discussed by Plaintiff, the Court rejects Wellpath's argument that Plaintiff may not assert her negligence claim because it is duplicative of her *Monell* claim.

PAGE 15 – OPINION AND ORDER

the same allegations discussed above that fail to state a claim against Wellpath. Plaintiff fails to demonstrate how Wellpath's actions amount to negligence that caused harm to Rader when Wellpath was only responsible for medical care, and not mental health care, in the Jail.

### D. Gross Negligence Claim

Under Oregon law, gross negligence "is negligence of a substantially greater degree than that of ordinary negligence." *Howard v. Chimps, Inc.*, 251 Or. App. 636, 647 (2012) (quotation marks omitted). "To establish gross negligence, plaintiff [must] show that defendant acted with reckless disregard of safety or indifference to the probable consequences of its acts." *Id.*

Plaintiff alleges that Wellpath was grossly negligent based on the same conduct for which Plaintiff alleges Wellpath was negligent. Plaintiff's gross negligence claim further alleges that this misconduct caused Rader severe physical, emotional, and mental distress and eventually caused Rader's suicide. Plaintiff, however, does not allege how Wellpath's alleged failure to provide medical services caused Rader's harm. Even though Wellpath allegedly knew that Rader required extra monitoring because of his expressed mental health issues, Wellpath was contracted to provide medical services, and Plaintiff fails to allege how these medical services could have prevented Rader's suicide.

## CONCLUSION

The Court GRANTS Defendants Wellpath and Petraseks' Motion to Dismiss. ECF 18. Plaintiff may file an amended complaint by January 17, 2024.

**IT IS SO ORDERED**.

DATED this 3rd day of January, 2024.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge