# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **RENEE WARREN,** Personal Representative of the ESTATE OF SHANE EARL RADER, Deceased,<br><br>        Plaintiff,<br><br>    v.<br><br>**YAMHILL COUNTY**, an Oregon County; **TIM SVENSON**, an individual; **MICHAEL PETRASEK**, an individual; **JEREMY RUBY**, an individual; **RICHARD GEIST**, an individual; **TAMARA HART**, an individual; **TONI SANZANO**, an individual; **AUDREY SPENCER**, an individual; **WELLPATH, LLC**, a Delaware corporation; **VIVEK SHAH**, an individual; and **JOHN DOES 1-10**,<br><br>        Defendants. | Case No. 3:23-cv-911-SI<br><br>**OPINION AND ORDER** |

Matthew D. Kaplan, MATTHEW D. KAPLAN, LLC, 50 SW Pine Street, Suite 302, Portland, OR 97204, and Nadia H. Dahab, SUGERMAN DAHAB, 101 SW Main Street, Suite 910, Portland, OR 97204. Of Attorneys for Plaintiff.

Lauren E. Nweze, William E. Stabler, & David C. Lewis, LEWIS, NWEZE & STABLER, 15875 Boones Ferry Road, #1469, Lake Oswego, OR 97035. Of Attorneys for Yamhill County, Tim Svenson, Jeremy Ruby, Tamara Hart, Toni Sanzano, and Audrey Spencer.

Jonathan David Ballard & Ross C. Taylor, FOX BALLARD PLLC, 1325 Fourth Avenue, Suite 1500, Seattle, WA 98101. Of Attorneys for Nurse Michael Petrasek and Wellpath, LLC.

Robert E. Franz, Jr. & Sarah R. Henderson, LAW OFFICE OF ROBERT E. FRANZ, JR., P.O. Box 62, Springfield, OR 97477. Of Attorneys for Richard Geist.

Ross C. Taylor, FOX BALLARD PLLC, 1325 Fourth Avenue, Suite 1500, Seattle, WA 98101. Of Attorney for Dr. Vivek Shah.

PAGE 1 – OPINION AND ORDER

**Michael H. Simon, District Judge.**

Plaintiff Renee Warren brings claims as the personal representative for the estate of Shane Earl Rader ("Rader"), who died in the Yamhill County Jail ("Jail"). Plaintiff originally alleged several constitutional violations under 42 U.S.C. § 1983 and negligence claims against Yamhill County ("County") and its employees, as well as Wellpath, LLC ("Wellpath") and its employees, Registered Nurse ("RN") Michael Petrasek and John Does 6-10. Wellpath contracted with the County to provide medical care in the Jail. The Court granted a motion to dismiss filed by Wellpath and its employees. Plaintiff filed a First Amended Complaint ("FAC").

Plaintiff continues to bring claims against the County and its employees and brings amended claims against Wellpath and its employees RN Petrasek, Dr. Vivek Shah, MD, and John Does 6-10 (collectively, the "Wellpath Defendants"). Plaintiff asserts claims for alleged constitutional violations under § 1983 and negligence. The Wellpath Defendants have again filed a motion to dismiss. For the reasons stated below, the Court grants that motion in part.

## STANDARDS

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the nonmoving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself

effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The court must draw all reasonable inferences from the factual allegations in favor of the plaintiff. *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit a plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epsten Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation marks omitted).

## BACKGROUND

### A.  Rader's Time at the Jail

On June 15, 2021, the Newberg-Dundee Police Department arrested Rader and processed him into the Jail. FAC (ECF 35) ¶¶ 1, 39-40. Rader told the arresting officer that he needed medical and mental health care. *Id.* ¶ 39. During his booking, Rader stated that he had a history of suicide attempts and had thoughts of killing his family and himself earlier that day. *Id.* ¶ 41. Rader was moved to a medical cell and placed on suicide watch. *Id.* A Wellpath emergency medical technician ("EMT") completed a Screening Exception Form, which documented that two attempts to screen Rader for medical issues failed because of the suicide watch, Rader's

mental instability, and safety concerns. *Id.* ¶ 42. Wellpath staff did not attempt to medically screen Rader again until June 28. *Id.* ¶¶ 46, 51, 53, 56-57.

Two qualified mental health professionals ("QMHPs") employed by the County visited Rader over the next two days. *Id.* ¶¶ 44, 48. On June 16, 2021, the first QMHP diagnosed Rader with an intellectual disability and continued his suicide watch. *Id.* ¶ 45. On June 17, 2021, the second QMHP agreed that Rader exhibited an intellectual disability. *Id.* ¶ 49. After Rader denied suicidal ideation, the QMHP recommended that Rader be removed from suicide watch, which he was. *Id.* At the QMHP's direction, Jail staff moved Rader to a camera-monitored segregation cell. *Id.* ¶ 50. Jail staff and Wellpath had access to the camera feed. *Id.* ¶¶ 58-59. As a post-suicide watch precaution, Rader was instructed to press his cell's intercom button if he experienced thoughts of suicide. *Id.* ¶ 49.

For the next four days, from June 18 to June 21, 2021, one of the County QMHPs visited Rader once per day. *Id.* ¶ 52. Rader was removed from post-suicide watch precautions on June 25, 2021. *Id.* ¶ 55.

On June 28, 2021, a Wellpath RN attempted to physically examine Rader, but Rader refused the exam. *Id.* ¶ 57. The next day, June 29, 2021, Rader died by suicide in his cell. *Id.* ¶¶ 61-66. A Jail deputy monitored Rader's and others' cells by camera but did not respond to Rader's visible condition and distress for more than ten minutes. *Id.* ¶¶ 61-63. Help arrived about fifteen minutes after Rader began to die, but lifesaving efforts by Jail staff, Wellpath staff, and paramedics did not succeed. *Id.* ¶¶ 61, 64-66.

**B. National Commission on Correctional Health Care Standards**

The National Commission on Correctional Health Care ("NCCHC") publishes a set of standards for health services in jails ("NCCHC Jail Standards"). *Id.* ¶ 24. Wellpath stated that its services at the Jail would meet the NCCHC Jail Standards. *Id.*

The fundamental principle of the NCCHC Jail Standards is that "[i]nmates must have access to care to meet their serious health needs." NCCHC Jail Standards J-A-01. "Unreasonable barriers" to health services offend this principle, such as a health service system that is understaffed, underfunded, or poorly organized with "the result that it is not able to provide appropriate and timely access to care." *Id.* The NCCHC Jail Standards declare it "essential" that "[s]uicides are prevented when possible by implementing prevention efforts and intervention." NCCHC Jail Standards J-B-05. The NCCHC also publishes standards for mental health care providers.

## C.  Wellpath

The County contracted with Wellpath in 2017 to provide medical care and pharmaceutical services to those in custody at the Jail. FAC ¶ 23. The County provided mental health care.[1] The contract required Wellpath to identify persons in custody at the Jail with medical or mental health conditions that incarceration may worsen and that may require extensive care. *Id.* The contract required, after a review for safety and security, that the County work with Wellpath to release, transfer, or otherwise remove these persons from the Jail. *Id.*

Several counties have complained or litigated about deficient services by Wellpath. *Id.* ¶¶ 83 (Pierce County, Washington), 86 (Collin County, Texas), 89 (Fulton County, Georgia), 90 (Kitsap County, Washington), 93 (Clark County, Washington). Plaintiff lists six suicides and one attempted suicide since 2016 at other county jails where Wellpath provided medical and mental

---

[1] Wellpath's contract "was for medical care and pharmaceutical services only." FAC ¶ 38. The County employed all mental health providers mentioned in the FAC. *See id.* ¶¶ 12, 13, 20. Though the FAC does not affirmatively state that Wellpath did *not* provide mental health care at the Jail, the Wellpath Defendants argue as much, and Plaintiff does not contradict that characterization. Plaintiff instead reiterates that Wellpath was required "to coordinate care," an argument addressed below.

health services. *Id.* ¶¶ 85 (Montrose County, Colorado, 2016), 87 (attempt, Kitsap County, Washington, 2017), 88 (Mesa County, Colorado, 2017), 91 (Arapahoe County, Colorado, 2017), 94 (Josephine County, Oregon, 2018), 96 (Monterey County, California, 2021), 97 (same, 2022).

Plaintiff also notes two deaths at the Jail that occurred in 2018 and 2021, years during which Wellpath provided medical and pharmaceutical services. *Id.* ¶¶ 92, 95. In 2018, a person in custody at the Jail died of severe alcohol withdrawal three hours and thirty minutes after booking. *Id.* ¶ 92. That person did not receive medical treatment. *Id.* In 2021, a person in custody at the Jail died by suicide. *Id.* ¶ 95. That person died after being removed from suicide watch and placed on the same post-suicide watch precautions and in the same type of cell as Rader. *Id.*

## DISCUSSION

The Wellpath Defendants argue that Plaintiff's claims fail because: (A) Plaintiff does not adequately allege a policy or custom by Wellpath as required to plausibly allege liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978) for Plaintiff's claims under § 1983; (B) Plaintiff does not allege facts relating to Wellpath's named employees or Doe Defendants sufficient to state a claim for supervisory liability; and (C) Plaintiff does not allege facts relating to Wellpath's responsibility for Rader's mental health care sufficient to support Plaintiff's negligence claims. The Court addresses each argument in turn.

### A. Section 1983 *Monell* Deliberate Indifference Claim Against Wellpath

Count Two of Plaintiff's second claim for relief asserts a § 1983 *Monell* claim against Wellpath. Plaintiff alleges *Monell* liability under a theory that Wellpath was deliberately indifferent to Rader's serious medical needs through several policies, customs, or practices that deprived Rader of his Eighth Amendment and Fourteenth Amendment rights. Wellpath responds to each alleged policy, challenging its sufficiency to support the claim, and argues that Plaintiff did not allege an underlying constitutional violation.

### 1.  Applicable Law

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage of any State" who "subjects, or causes to be subjected" any person within the jurisdiction of the United States to the "deprivation of any rights, privileges, or immunities secured by the Constitution and the laws, shall be liable to the party injured." 42 U.S.C. § 1983. Although a municipality or other local government is a "person[]" who may be sued under § 1983, *Duarte v. City of Stockton*, 60 F.4th 566, 568 (9th Cir. 2023), it may not be held liable "for an injury inflicted solely by its employees or agents," *Monell*, 436 U.S. at 694. In other words, § 1983 does not allow recovery for the actions of a local government's employees under a theory of *respondeat superior* liability. *Id.* at 691. Instead, a plaintiff must demonstrate that a municipality had a "policy" that was the "moving force" behind a violation of the plaintiff's constitutional rights. *See Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013); *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

To meet the "moving force" requirement, "the plaintiff must show both causation-in-fact and proximate causation." *Gravelet-Blondin*, 728 F.3d at 1096. A plaintiff can demonstrate causation-in-fact "only if the injury would not have occurred 'but for' [the defendant's] conduct." *Chaudhry v. Aragón*, 68 F.4th 1161, 1169 n.11 (9th Cir. 2023) (quoting *White v. Roper*, 901 F.2d 1501, 1505 (9th Cir. 1990)). In the context of *Monell* liability, a plaintiff can meet this burden by "establish[ing] that the injury would have been avoided had proper policies been implemented." *Long v. County of Los Angeles*, 442 F.3d 1178, 1190 (9th Cir. 2006) (quotation marks omitted). To demonstrate proximate causation, a plaintiff must establish that any "intervening actions were within the scope of the original risk and therefore foreseeable." *Van Ort v. Est. of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996) (quoting *Dodd v. City of Norwich*, 827 F.2d 1, 6 (2d Cir. 1987)).

PAGE 7 – OPINION AND ORDER

"A 'policy' is a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (cleaned up). A plaintiff can show a "policy," as that term is used for *Monell* liability, "in one of three ways." *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 883 (9th Cir. 2022).

> First, the [municipality] may be held liable if it acted pursuant to an expressly adopted official policy. Second, the [municipality] may be held liable based on a longstanding practice or custom. Third, the [municipality] may be held liable if the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it.

*Id.* (quotation marks and citations omitted); *see also Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."); *Gordon v. County of Orange*, 6 F.4th 961, 973-74 (9th Cir. 2021) (describing the three ways "[a] plaintiff can satisfy *Monell's* policy requirement").

The Ninth Circuit recognizes that a local government body can be held liable under § 1983 for "policies" of inaction or omission. Some cases, generally older decisions, refer to this as a separate "path" to liability distinct from the "direct path" of the municipality *itself* violating the plaintiff's rights or directing its employees to do so.[2] *See Gibson v. County of Washoe*, 290 F.3d 1175, 1185 (9th Cir. 2002), *overruled on other grounds by Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016); *see also Tsao*, 698 F.3d at 1144. In this separate path to liability,

---

[2] "Under [the] 'direct path' to municipal liability, a plaintiff must prove that the municipality acted with the state of mind required to prove the underlying violation, just as a plaintiff does when he or she alleges that a natural person has violated his federal rights." *Tsao*, 698 F.3d at 1144 (quotation marks omitted).

a municipality can be held responsible "for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation." *Gibson*, 290 F.3d at 1185; *see also Tsao*, 698 F.3d at 1143; *Hyun Ju Park v. City & County of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020). More recent cases, however, generally describe claims for such policies of inaction or omission as a type of custom or practice claim. *See, e.g.*, *Sabra*, 44 F.4th at 884; *Gordon*, 6 F.4th at 973. Regardless of how such claims are categorized, the Ninth Circuit is consistent in describing the heightened requirements that a plaintiff must show to prove a violation based on inaction or omission to avoid imposing *respondeat superior* liability.

A policy of inaction or omission may be based on a government body's "failure to implement procedural safeguards to prevent constitutional violations." *Tsao*, 698 F.3d at 1143; *see also Sabra*, 44 F.4th at 884. A plaintiff who alleges a policy of inaction, however, must establish that such a policy amounts to deliberate indifference to the plaintiff's constitutional rights. *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997); *Hyun Ju Park*, 952 F.3d at 1141; *see also Oviatt ex rel. Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) ("To impose liability on a local governmental entity for failing to act to preserve constitutional rights, a section 1983 plaintiff must establish: (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation." (quotation marks omitted)).

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61

(cleaned up). "Deliberate indifference exists when the need for more or different action is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *Hyun Ju Park*, 952 F.3d at 1141 (cleaned up). "This requires a showing that the facts available to the [municipality] put it on actual or constructive notice that its practices . . . were substantially certain to result in the violation of the constitutional rights of its citizens." *Sandoval v. County of San Diego*, 985 F.3d 657, 682 (9th Cir. 2021) (cleaned up). Deliberate indifference ordinarily is shown through "a pattern of prior, similar violations of federally protected rights, of which the relevant policymakers had actual or constructive notice." *Hyun Ju Park*, 952 F.3d at 1142. Deliberate indifference also may be shown if a policy is "so facially deficient that any reasonable policymaker would recognize the need to take action." *Id.* at 1141.

### 2.   Wellpath's Alleged Policies

As a pretrial detainee, Rader had a clearly established, constitutional right to adequate medical care under the Fourteenth Amendment. *See Sandoval*, 985 F.3d at 667. According to Plaintiff, Wellpath violated that right with seven inadequate policies.

#### a.   A Policy of Relying on Video Monitoring

Plaintiff first alleges that Wellpath had a policy of relying on remote video monitoring of inmates and detainees instead of conducting physical visits. FAC ¶ 112(a). Plaintiff alleges another instance of Wellpath adhering to this policy: the 2018 death of a person in custody at the Jail who was only remotely monitored and not visited in person by Wellpath medical providers who could have saved the person's life. *Id.* ¶¶ 78, 92. Had Wellpath physically visited Rader, Plaintiff continues, its staff would have recognized his serious medical and mental health needs and treated him with prescription medication.

In fact, a Wellpath RN did physically visit Rader in his cell. *Id.* ¶ 57. The RN attempted a physical examination, but documented that Rader refused the examination. *Id.* Even if a completed physical examination would have discovered a need for prescription medication, Wellpath's failure to provide medication stems at most from the lack of the examination, and not from a policy of relying on video monitoring. Further, Plaintiff does not allege that lack of physical monitoring factored into Rader's suicide. The Court therefore agrees with the Wellpath Defendants that this policy does not support a *Monell* claim.

### b. A Policy of Failing to Coordinate Care

Plaintiff next alleges a policy of failing to properly coordinate care, including by failing to provide a written policy addressing this coordination or protocols through which to escalate an inmate or detainee's level of medical or mental health treatment. *Id.* ¶ 112(b). According to Plaintiff, this policy of inaction caused County mental health providers to not coordinate Rader's care with Wellpath providers who could prescribe medication. *See id.* ¶¶ 45, 49-50, 52, 67. Because this is the only theory of causation that Plaintiff supports with factual allegations, the Court accordingly narrows its analysis of this policy.

Plaintiff alleges that, had Rader been provided access to Wellpath providers who could prescribe medication, he may not have died of suicide. *Id.* ¶ 68. But Plaintiff fails to connect Wellpath's alleged *coordination* policy with this outcome. The FAC accounts three occasions when Wellpath was involved with Rader's health—its attempted examinations of Rader on June 15 (two attempts) and June 28, 2021. *Id.* ¶¶ 42, 57. Plaintiff does not allege that, if Wellpath had a policy or protocols to address coordination of care, County mental health providers would have acted differently or that Wellpath providers would have seen Rader more than these three times. Plaintiff offers only general, conclusory allegations that a coordination of care would have made a difference in Rader's treatment. Plaintiff does not specifically allege how Wellpath's

coordination of care was deficient or how that purported deficiency in *coordination of care* (as opposed to Wellpath *providing care*) caused Rader's suicide. This policy therefore does not support a *Monell* claim.

### c.    A Policy of Failing to Provide Access to Qualified Health Providers

Plaintiff's third alleged policy of inaction is of failing to provide access to qualified medical and mental health providers, including by failing to prescribe medication, provide constant observation, conduct intake screening, and transfer an adult in custody, if necessary, to a facility equipped with such providers. *Id.* ¶ 112(c). Plaintiff alleges other instances when Wellpath plausibly failed to provide access to qualified health providers to adults in custody (unless otherwise noted, Wellpath provided both medical and mental health services):

- In 2015 in Pierce County, Washington, when that county complained of staff shortages and lack of trained personnel, among other issues, *id.* ¶ 83;

- In 2016 in Collin County, Texas, when that county complained of 80 inmates waiting to see a psychiatrist, *id.* ¶ 86;

- In 2017 in Kitsap County, Washington, when a person in custody did not see any health provider after attempting suicide, and when that county later complained of Wellpath's staffing issues, *id.* ¶¶ 87, 90;

- In 2018 in Arapahoe County, Colorado, when a person in custody died by suicide soon after booking and never saw any medical or mental health provider, *id.* ¶ 91;

- In 2018 in the (Yamhill) County, when a person in custody received no treatment for severe alcohol withdrawal (Wellpath provided medical services only), *id.* ¶ 92;

- In 2018 in Clark County, Washington, when the county complained of Wellpath's "inability to staff," *id.* ¶ 93;

- In 2018 in Josephine County, Oregon, when a person in custody with severe mental illness died by suicide after not being seen by a health provider for her entire 40 days in custody, *id.* ¶ 94; and

- In 2021 in the (Yamhill) County, when a person in custody died by suicide after requesting, but not receiving, antidepressant medication (Wellpath provided medical services only), *id.* ¶ 95.

In the above instances, except for those in the County, Wellpath provided *both* medical and mental health services. Plaintiff does not explain how these instances demonstrate the same type of failure as in Rader's situation, where Wellpath only provided medical services. Drawing all reasonable inferences in Plaintiff's favor, however, this pattern of instances plausibly reflects a longstanding practice of Wellpath's that is sufficient to show the existence of the alleged policy. Wellpath has a longstanding pattern and practice of failing to provide sufficient staffing, whether medical, psychiatric, or both. Again viewing the facts in Plaintiff's favor, these instances put Wellpath on notice that its policy violates the constitutional rights of persons in custody. These allegations are sufficient to show deliberate indifference. *Cf. Tabb v. NaphCare*, 2024 WL 1905638, at *7 (W.D. Wash. May 1, 2024) (finding that the plaintiff adequately alleged that medical services had a "policy of inaction [of] 'fail[ure] to provide adequate medical care'" that amounted to deliberate indifference and was the cause of the constitutional violation).

Plaintiff also alleges sufficient facts to show causation at this stage of the litigation. She alleges that Rader needed prescription medication to treat his mental health needs and that the lack of medication factored into his suicide. FAC ¶ 67-68. Plaintiff connects this need to specific facts: according to Plaintiff, the QMHPs who visited Rader noted a continuing suicide risk, which indicates a potential need for prescription medication. *Id.* ¶ 52. Plaintiff contends that this need would have been addressed with access to qualified medical providers. *Id.* ¶ 68.

The Wellpath Defendants argue that Wellpath had no obligation to provide access to mental health care providers. This may be true to some extent, but the Wellpath Defendants do not dispute that the County mental health providers who saw Rader could not prescribe medication nor that Wellpath had an indirect role in mental health treatment for this reason. The Court accordingly finds that this policy supports Plaintiff's *Monell* claim against Wellpath.

### d.  A Policy of Conducting Improper and Incomplete Intake Screenings

Plaintiff next alleges a policy of conducting improper or incomplete screenings before admitting or booking individuals. *Id.* ¶ 112(d). In addition to Wellpath's failure to properly screen Rader, Plaintiff alleges the death of a person in custody at the Jail in 2018 for whom Wellpath did not complete an intake screening. *Id.* Plaintiff adds that in 2015, Pierce County, Washington complained of Wellpath's "failure to triage" and issues at booking. *Id.* ¶ 83. These facts make it plausible that Wellpath had a longstanding practice of conducting improper or incomplete intake screenings. The death in 2018 should have put Wellpath on notice of the risks of incomplete intake screenings, so Plaintiff alleges enough to show deliberate indifference.

Plaintiff also adequately alleges causation: as discussed, a proper intake screening could have revealed that Rader had health needs requiring prescription medication, extensive care, or transfer. Although a Wellpath employee attempted to screen Rader on the day he was booked, the employee submitted a Screening Exception Form that noted that Rader was on suicide watch and was mentally unstable. Persons in custody who cannot be screened because of mental health are often those who are in the greatest need of medical intervention, and instead of noting that Rader may need additional treatment, the Wellpath employee simply filled out an exemption form. Plaintiff alleges that the QMHPs' notes on Rader showed continuing health needs, which Wellpath had no opportunity to evaluate due to its failure to properly screen. *Id.* ¶ 52. Had Wellpath evaluated Rader's needs, Plaintiff alleges, it could have prescribed appropriate medication, provided other appropriate care, or recommended that Rader be transferred. The Court accordingly finds that this policy supports Plaintiff's *Monell* claim against Wellpath.

### e.  A Policy of Insufficient Medical Coverage

Plaintiff's fifth alleged policy is of providing insufficient medical coverage at the Jail. *Id.* ¶ 112(e). This policy is sufficiently stated to the same extent as the third alleged policy because

medical coverage is largely coextensive with access to medical providers. For the reasons discussed *supra*, the Court finds that this policy has been adequately alleged.

### f.   A Policy of Failing to Meet Standards

Plaintiff's sixth alleged policy is of failing to meet community standards of care for medical and mental health services. FAC ¶ 112(f). This policy lacks sufficient specificity. Without stating with which standards Wellpath fell short of and how, and how doing so caused Rader's suicide, the allegations do not "give fair notice and . . . enable" Wellpath "to defend itself effectively." *Starr*, 652 F.3d at 1216. Plaintiff does list a sampling of NCCHC Jail Standards but does not connect them to Wellpath's conduct except to say they required Wellpath to coordinate care with the County. That concern was addressed by Plaintiff's alleged policy of failure to coordinate care, which the Court has found insufficient to support a *Monell* claim. The Court accordingly finds this policy insufficiently alleged to support Plaintiff's *Monell* claim.

### g.   A Policy of Relying on Inadequately Trained Jail Staff

Finally, Plaintiff alleges a policy of relying on inadequately trained Jail staff to conduct medical monitoring of persons in custody at the Jail. FAC ¶ 112(g). Plaintiff does not explain how this reliance caused Rader's death and other injuries. To the extent the Court can infer causation from Plaintiff's factual allegations, the outcome is similar to the policies of relying on video monitoring and failing to coordinate care: this policy only deprived Wellpath of *additional* opportunities to discover Rader's needs beyond the three opportunities that Wellpath had. The Court accordingly finds this policy insufficiently alleged.

### 3.   Underlying Constitutional Violation

The Wellpath Defendants also challenge whether Plaintiff has alleged an underlying constitutional violation to support her *Monell* claims. Under Wellpath's alleged policy of conducting improper and incomplete intake screenings, the deliberate conduct was the actions

that Wellpath employees took in delaying screening and improperly documenting a refusal of screening. Under Wellpath's alleged policy of providing insufficient medical coverage, the deliberate conduct was Wellpath's allocation and provision of medical resources. Plaintiff has adequately alleged underlying deliberate conduct to support her § 1983 *Monell* claim.

### 4. Summary

The Court allows Plaintiff's § 1983 claim against Wellpath Defendants to proceed based on the following alleged policies:

- Failing to provide access to qualified health providers;

- Conducting improper and incomplete intake screenings; and

- Providing insufficient medical coverage.

The Court dismisses Plaintiff's § 1983 claim against Wellpath Defendants as to the following alleged policies:

- Relying on video monitoring;

- Failing to coordinate care;

- Failing to meet standards; and

- Relying on inadequately trained Jail staff.

## B. Supervisory Liability Claim

Plaintiff's third claim for relief asserts a § 1983 supervisory liability claim against RN Petrasek, Dr. Shah, and John Does 6-10, all employees of Wellpath with duties to supervise other Wellpath staff. In each instance in which Plaintiff alleges liability, the acts boil down to failing to correct inadequate Wellpath policy.

Liability under § 1983 requires "personal participation by the defendant. A supervisor is only liable for the constitutional violations of . . . subordinates if the supervisor participated in or

directed the violations, or knew of the violations and failed to act to prevent them. There is no respondeat superior liability under [§] 1983." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (cleaned up). Supervisors "can be held liable for: 1) their own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) for conduct that showed a reckless or callous indifference to the rights of others." *Hyde v. City of Willcox*, 23 F.4th 863, 874 (9th Cir. 2022) (quoting *Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000)). Supervisory liability requires "(1) [a supervisor's] personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Rodriguez v. County of Los Angeles*, 891 F.3d 776, 798 (9th Cir. 2018) (quoting *Keates v. Koile*, 883 F.3d 1228, 1242-43 (9th Cir. 2018)). "The requisite causal connection can be established by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Id.* (cleaned up).

RN Petrasek worked as a nurse and Health Services Administrator at the Jail. In that role, Plaintiff alleges that RN Petrasek was responsible for implementing Wellpath's policies and procedure, including the administration of the contract between Wellpath and the County, ensuring that policies exist to provide persons in custody with necessary care, and supervising Wellpath medical staff. Plaintiff also alleges that RN Petrasek oversaw and administered the *Jail's* medical policies. Plaintiff further alleges that RN Petrasek knew that the County mental health providers could not provide prescription pharmaceuticals to persons in custody and failed to take steps to ensure coordination of care between Wellpath providers and mental health staff. The Wellpath Defendants argue that these allegations do not show personal involvement by RN

Petrasek. The Court agrees. As an initial matter, RN Petrasek cannot have supervisor liability for the alleged policies for which Plaintiff fails to state a claim. Plaintiff also does not plausibly allege that RN Petrasek had sufficient personal participation in the policies by merely being responsible for implementing, not developing, Wellpath's policies. Plaintiff therefore has not stated a § 1983 supervisory liability claim against RN Petrasek.

Dr. Shah, a resident of California, was further removed from the Jail. Dr. Shah worked for Wellpath as a regional director for a region including Oregon. This position's exact duties do not appear in Plaintiff's FAC, but Plaintiff does allege that Dr. Shah was in charge of oversight and clinical support for Wellpath providers at the Jail. Plaintiff does not allege that Dr. Shah knew about problems at the Jail, but only that he should have known. With nothing to show a closer connection between Dr. Shah and the policies that violated Rader's constitutional rights, the FAC lacks sufficient factual allegations to state a facially plausible § 1983 supervisory liability claim against Dr. Shah.

The Wellpath Defendants observe that Plaintiff alleges substantially nothing about John Does 6-10. Plaintiff does not respond, conceding the point. *See Walsh v. Nev. Dep't of Hum. Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006) ("A plaintiff who makes a claim . . . in his complaint, but fails to raise the issue in response to a defendant's motion to dismiss . . . has effectively abandoned his claim. . . ."). Plaintiff has thus not stated a § 1983 supervisory liability claim against John Does 6-10.

## C.  Negligence and Gross Negligence Claims

Plaintiff's fourth and fifth claims for relief assert negligence and gross negligence claims against Wellpath. The operative complaint alleges instances of negligence that are specific to Rader, but Plaintiff also realleges and incorporates all previous paragraphs such that the Court

may consider Wellpath's underlying policies. The Wellpath Defendants move to dismiss these claims, raising agency issues and challenging the factual sufficiency of Plaintiff's allegations.

Common-law negligence under Oregon law generally requires:

> (1) that defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that defendant's conduct was unreasonable in light of the risk, (4) that the conduct was a cause of plaintiff's harm, and (5) that plaintiff was within the class of persons and plaintiff's injury was within the general type of potential incidents and injuries that made defendant's conduct negligent.

*Solberg v. Johnson*, 306 Or. 484, 490-91 (1988), *abrogated on other grounds by Deckard v. Bunch*, 358 Or. 754 (2016). If there is a special relationship, however, the foreseeability element is replaced by a duty-breach analysis. *Fazzolari v. Portland Sch. Dist. No. 1J*, 303 Or. 1, 17 (1987). Inmates and their jailors have a special relationship. *See Hanington v. Multnomah County*, 593 F. Supp. 3d 1022, 1044 (D. Or. 2022) (collecting cases); *Crane v. United States*, 2013 WL 1453166, at *5 (D. Or. Mar. 21, 2013) (stating that deputies must "care for the prisoners in their custody and generally protect them from harm"); *see also* Or. Rev. Stat. § 169.140 ("[L]ocal correctional facility shall . . . supply . . . necessary medical aid."). When a party delegates its constitutional or statutory duty to another party and the contractor assumes that responsibility, the contractor assumes that obligation and is subject to the same standard of care. *See Simms-Belaire v. Washington County*, 2024 WL 279020, at *19 (D. Or. Jan. 25, 2024) (finding contractor subject to same statutory duties as county).

Gross negligence "is negligence of a substantially greater degree than that of ordinary negligence." *Howard v. Chimps, Inc.*, 251 Or. App. 636, 647 (2012) (quotation marks omitted). "To establish gross negligence, plaintiff [must] show that defendant acted with reckless disregard of safety or indifference to the probable consequences of its acts." *Id.*

A plaintiff can allege a claim against an employer for negligence in hiring, instructing, or supervising. *See Vaughn v. First Transit, Inc.*, 346 Or. 128, 138 n.7 ("[A] principal may be directly liable for the tortious act of an agent if . . . the principal itself was negligent in hiring, instructing, or supervising the agent."). Negligence also allows for *respondeat superior* liability. "Under the doctrine of *respondeat superior*, an employer is liable for an employee's tort when the employee acts within the course and scope of employment." *Minnis v. Or. Mut. Ins.*, 334 Or. 191, 201 (2002). "A principal is liable to third persons for . . . torts and omissions of duty of his agent, when acting in the course of his employment . . . even if he forbade the acts or disapproved of them." *Larisa's Home Care, LLC v. Nichols-Shields*, 362 Or. 115, 138 (2017) (quoting *White v. Gordon*, 130 Or. 139, 143 (1929)).

Plaintiff alleges eight ways that Wellpath was allegedly negligent and grossly negligent:

- Failing to properly and fully screen Rader at the time that he was admitted to the Jail;

- Failing to recognize that Rader was not medically stable, was in need of mental health treatment, and was a risk to himself or others;

- Failing to adequately monitor Rader in his cell;

- Relying on remote video monitoring;

- Failing to coordinate care;

- Failing to ensure that Rader received access to qualified medical and mental health providers;

- Failing to ensure that staffing levels were sufficient to adequately monitor persons in custody; and

- Failing to ensure that the policies and practices then-existing at the Jail met widely accepted community standards of care.

FAC ¶¶ 129, 132. These instances are identical to or encompassed in the seven policies alleged in Plaintiff's § 1983 claim. For the policies that Plaintiff adequately alleges Wellpath's deliberate

indifference under § 1983, Plaintiff has sufficiently alleged that Wellpath met the less stringent standard of negligence. Plaintiff has also adequately alleged that Wellpath was grossly negligent because deliberate indifference meets the gross negligence standard of acting with "reckless disregard of safety or indifference to the probable consequences of its acts." *Howard*, 251 Or. App. at 647. For the instances where Plaintiff has not alleged deliberate indifference, Plaintiff fails to allege causation and thus also does not allege negligence and gross negligence. The Court therefore allows Plaintiff's negligence and gross negligence claims to proceed based only on the following instances: failing to screen Rader fully and properly; failing to recognize that Rader was not medically stable[3]; and failing to ensure that Rader had access to qualified health providers.

## CONCLUSION

The Court GRANTS IN PART AND DENIES IN PART Defendants Wellpath, Petrasek, and Shah's Motion to Dismiss. ECF 39. The Court grants the motion against Plaintiff's § 1983 claim in part as described herein, claims based on supervisory liability, and negligence and gross negligence claims in part as described herein. The Court denies in part the motion against Plaintiff's § 1983 claim and negligence and gross negligence claims in part as described herein. The Court dismisses all claims without leave to amend at this time.

**IT IS SO ORDERED**.

DATED this 16th day of October, 2024.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

---

[3] This instance was not one of the policies alleged in Plaintiff's § 1983 claim, but it is encompassed within the policy of failure to conduct proper screenings.